**BANCA DEL SEMPIONE**

v.

**SURIEL FINANCE, N.V. and Provident Bank of Maryland.**

**Civ. No. B–91–3179.**

United States District Court, D.Maryland.

May 18, 1994.

Warren L. Dennis, and Sheila M. Gowan, Proskauer Rose Goetz & Mendelsohn of Washington, DC; Paul W. Grace, Tydings & Rosenberg, Baltimore, MD. On brief, David I. Goldblatt, Esq., Proskauer Rose Goetz & Mendelsohn of Washington, DC, for plaintiff.

James M. Smith, and James T. Heidelbach, Gebhardt & Smith of Baltimore, MD. On brief, Michael D. Colglazier, and David P. King, Hogan & Hartson, Baltimore, MD, for defendant Provident Bank of Maryland.

WALTER E. BLACK, Jr., Chief Judge.

Presently pending before the Court is a Motion for Summary Judgment filed by defendant Provident Bank of Maryland ("Provident"). Plaintiff Banca del Sempione ("BDS") filed a Complaint on November 6, 1991, against Suriel Finance, N.V. ("Suriel") and Provident. In its Complaint, BDS alleged breach of contract by Suriel and wrongful dishonor, breach of contract, anticipatory breach of contract, and negligent misrepresentation by Provident, all in connection with a letter of credit issued by Provident. On June 9, 1992, BDS filed a First Amended Complaint adding a claim of common law fraud against Provident. The Court notes that Suriel has failed to answer or otherwise defend this action.

On August 10, 1992, Provident filed the present motion for summary judgment on all counts. Primarily, Provident contends that BDS has failed to state a claim for which relief can be granted under applicable contract and letter of credit principles. The issues raised by the motion have been fully briefed and the Court had the benefit of oral argument at a hearing held on January 15, 1993. In addition, the Court has had the benefit of responses provided by counsel to a question asked by the Court in a letter dated January 21, 1993.[1]

**I**

The instant litigation stems from Provident's refusal to honor a draft presented by BDS on a letter of credit issued by Provident. The events which precipitated this litigation began to unfold in the spring of 1989, when Rock Solid Investments Ltd. ("RSI"), a Baltimore-based venture capital company, sought a loan in order to provide capital for its projects. RSI ultimately found a willing lender in Suriel, which represented itself as international financing company backed by wealthy multinational investors with American offices in Vienna, Virginia. In actuality, Suriel was wholly-owned by a Panamanian corporation which in turn was wholly-owned by John Alvey, Suriel's sole officer. Moreover, the only funds available for Suriel to lend to RSI were funds lent to it by BDS, a Swiss bank.

On July 6, 1989, Suriel and RSI entered into an agreement wherein Suriel would loan RSI $6,700,000. Under the loan agreement, RSI was required to obtain a standby letter of credit issued in favor of Suriel, securing the interest payments due under the loan. This letter of credit was required to be irrevocable, unconditional, transferable, and annually renewable in the amount of $750,000 for a period of seven years. Suriel was also required under its loan agreement with BDS to obtain such a letter of credit to secure its loan.

After negotiations with another bank fell through, RSI applied to Provident for a letter of credit to be issued in favor of Suriel securing the interest payments due under the Suriel/RSI loan. Samuel Henry, a Vice President in Provident's Commercial Lending department, handled RSI's application. Negotiations then started between Henry, Eric Douglass, President of RSI, and Jean Farnan, a representative of Suriel. BDS, however, had no direct involvement in the negotiations, even though Suriel was required to transfer the letter of credit to BDS under the terms of its loan. On July 20, 1989, Henry prepared a loan summary and

---

**1.** The question asked by the Court in its January 21, 1993, letter was as follows:

What is in the record to reflect the transfer by Suriel of its rights under the Provident letter of credit to Banca del Sempione?

BDS replied to the Court's question by letter dated January 28, 1993, and Provident replied by letter dated January 29, 1993. Both BDS and Provident then provided the Court with additional letters dated February 2, 1993, and February 8, 1993, respectively.

credit analysis for a letter of credit with a "total exposure" of $750,000. After Provident approved the issuance of a letter of credit to RSI, Henry sent a Commitment Letter to Douglass on July 21, 1989. The Commitment Letter included a draft of an irrevocable letter of credit in the amount of $750,000 in favor of Suriel for a term of seven years. The Commitment Letter itself required that RSI deposit $800,000 with Provident as collateral for the letter of credit.

Sometime after Provident committed to issue its letter of credit, Farnan informed Henry that Suriel would not be satisfied with Provident's letter of credit alone in connection with the RSI/Suriel loan. Because of Provident's size, Suriel preferred that Provident's letter of credit be confirmed by a larger bank. On August 1, 1989, Henry arranged for Provident's letter of credit to be confirmed on a year to year basis by First National Bank of Maryland. However, by late August, 1989, the parties agreed to replace First National Bank of Maryland with Manufacturers Hanover Trust Company of New York ("Manufacturers") as the confirming bank for the letter of credit.

On August 30, 1989, Provident issued two documents in connection with the RSI/Suriel letter of credit. The first document, addressed to Suriel, was a draft of letter of credit 99205. The second document, addressed to Farnan individually, advised Farnan of certain commitments made by Provident in connection with letter of credit 99205.[2] On September 11, 1989, Suriel approved the text of the draft letter of credit and instructed Provident to proceed with the issuance of its letter of credit and Manufacturers' confirmation. Provident issued letter of credit 99205 ("the Provident LOC" or "99205") that day and sent instructions to Manufacturers to issue its confirmation.

On September 13, 1989, Farnan sent a letter to Henry seeking changes in the language of Manufacturers' confirmation. Henry replied by letter that day, refusing to reopen Manufacturers' confirmation for renegotiation of the language. Henry referred to the wording of a "side letter" that had been discussed by the parties, stating that he would not guarantee that Provident would obtain a replacement for Manufacturers if Manufacturers declined to renew its confirmation, but pledged to use "best efforts" to obtain one if necessary.

Manufacturers issued its confirmation, number U169123 ("the Manufacturers confirmation" or "U169123"), on September 14, 1989, quoting verbatim the Provident LOC:

> Gentlemen: We are instructed by the issuing bank noted above to advise you that they have established their Irrevocable Letter of Credit in your favor for USD. 750,000.00 as follows:

**2.** In pertinent part, the August 30, 1989, letter from Henry to Farnan provided:

I am pleased to advise you that Provident Bank of Maryland (the Bank), pertaining to the Suriel loan documents dated July 6, 1989 and for the term of the Letter of Credit, commits to the following:

1. Upon receipt of the net proceeds to be disbursed in the Rock Solid Investments' Provident Bank account, as specified in the "Direction to Pay Proceeds" letter from RSI to Suriel dated July 21, 1989, the Bank will immediately issue an authenticated telex to Manufacturers Hanover Bank of New York, the confirming bank, advising them of the receipt of said proceeds as per the loan documents dated July 6, 1989.

2. In the event Suriel must draw against the Standby Letter of Credit No. *99205* (L/C) issued by this Bank and confirmed by Manufacturers Hanover Trust Company of New York, this Bank will immediately amend the L/C to the original $750,000 credit available

level without equivocation, upon receipt of the cash collateral restoring the reserve fund to $800,000.00, as specified in our letter dated July 21, 1989.

3. The Bank agrees to place the original of this document at the Washington office of Reed, Smith, Shaw & McClay, the repository of the other executed loan documents of this Suriel transaction, and agrees that this document will upon execution become an integral part of the loan documentation of said documented loan.

4. Upon the issuance of any amendment *as described in item 2 above,* the Bank will immediately notify Suriel, at the address and by the means of Suriel's choice, that said amendment has been issued and that the original $750,000 Letter of Credit has been restored.

We hope that this letter serves Suriel's purpose in showing our commitment to revolve the L/C conditioned only upon receipt of the replenishing cash collateral.

Quote

Suriel Finance, N.V.

Gentlemen: We hereby issue in your favor this Irrevocable Letter of Credit for the account of Rock Solid Investments, Ltd., 2401 Sinclair Lane, Baltimore, Maryland 21213, in an amount of USD.750,000.00 which is available by your sight draft drawn on Manufacturers Hanover Trust Company marked: "Drawn under Irrevocable Letter of Credit Number 99205 issued by Provident Bank of Maryland dated September 11, 1989".

This Letter of Credit is subject to the following terms and conditions:

1. Sight draft(s) drawn hereunder must be accompanied by:

A) A statement purportedly signed by an authorized representative of the Beneficiary or Transferee stating: "We certify that Rock Solid Investment, Ltd. has failed to fulfill its obligations under a loan granted to Rock Solid Investments, Ltd. by Suriel Finance, N.V. and the drawing under Letter of Credit No. 99205 in the amount of USD. _____ represents the defaulted interest due under such loan dated July 6, 1989".

B) The original of the Letter of Credit and any amendments hereto.

2. This Letter of Credit will expire on September 15, 1996.

3. Partial drawings are permitted.

4. Drawings under this Letter of Credit are not permitted until Manufacturers Hanover Trust Company is in receipt of an authenticated telex from Provident Bank of Maryland stating that Rock Solid Investments, Ltd. is in receipt of funds from Suriel Finance, N.V. per the terms of the Loan Agreement dated July 6, 1989 between Rock Solid Investments, Ltd. and Suriel Finance, N.V. In no event shall drawings under this Letter of Credit occur prior to October 6, 1989.

5. This Letter of Credit is transferable in its entirety.

6. We hereby engage with Drawer, Drawee and Bonafide Holders that draft(s) drawn as specified herein will be duly honored on presentation.

7. The Letter of Credit is subject to the Uniform Customs and Practices for Documentary Credits (1983 Revision) International Chamber of Commerce Publication No. 400.

Unquote

At the request of the issuing bank indicated above, We are quoting their Letter of Credit established in your favor.

We confirm the credit until September 15, 1990 and thereby undertake that all drawings drawn under and in compliance with the terms of the credit will be duly honored by us on delivery of documents as specified if presented at this office on or before the expiry date of our confirmation i.e. September 15, 1990.

It is a condition of the confirmation of this Letter of Credit by Manufacturers Hanover Trust Company that such confirmation shall expire on September 15, 1990 but that its confirmation shall be automatically extended for additional periods of one year from the present of each future confirmation expiry date, however, in no event shall the expiry date of our confirmation be extended beyond the final expiry date of September 15, 1996, unless at least 45 days prior to such date Manufacturers Hanover Trust Co. notifies you either in writing by certified mail, (Return Receipt Requested), teletransmission or hand delivery that it elects not to renew its confirmation of this Letter of Credit for such additional periods. Such notice shall be effective upon dispatch by Manufacturers Hanover Trust Company.

Notwithstanding anything to the contrary hereinbefore stated, if this Letter of Credit is in existence after the expiration of Manufacturers Hanover Trust Company's confirmation of this Letter of Credit, then this Letter of Credit is available with Provident Bank of Maryland by payment against presentation of the documents detailed herein accompanied by your drafts at sight drawn on Provident Bank of Maryland. No mention of Manufacturers Hanover Trust Company's Advice Number U169123 need be made in the documents detailed herein. Provident Bank of Maryland's Letter of Credit Number 99205 and the date of their

Letter of Credit and the name of Provident Bank of Maryland must be quoted on all drafts required.

This Letter of Credit is transferable. We shall not recognize any transfer of this Letter of Credit until this original Letter of Credit and a signed and completed transfer form satisfactory to us is received by us and our transfer charges are paid by Bank or certified check (transfer charges are ¼ percent of the transferred amount, minimum charge USD.150.00) The forms required will follow by mail.

In case of any transfer under this Letter of Credit, draft and required statement must be executed by the transferee.

Please direct all correspondence in connection with this Letter of Credit to the attention of the Standby Letter of Credit Department.

This credit is subject to the Uniform Customs and Practices for Documentary Credits (1983 Revision, International Chamber of Commerce, Paris, France, Publication No. 400).

A copy of the Manufacturers confirmation was sent to Suriel and to BDS as Suriel's advising bank. Neither Provident nor Manufacturers knew at that time of the BDS/Suriel loan or that BDS required Suriel to transfer the beneficiary rights under the letter of credit to BDS.

Even though the Provident LOC and the Manufacturers confirmation had been issued, Farnan and Suriel continued to request changes in the language memorializing the commitments of the parties. Unbeknownst to Henry, BDS did not feel that the Provident LOC met their requirements under the BDS/Suriel loan. In particular, BDS objected that the August 30, 1989, letter from Henry to Farnan established that, in the event that the $750,000 was depleted, the Provident LOC would only be restored to $750,000 upon the replenishment of collateral. Instead, BDS required that the letter of credit be unconditionally renewable at $750,000 every year. Accordingly, BDS sent a telefax to Farnan on September 14, 1989, asking that the following amendment be inserted in the letter of credit:

The effective date of the Letter of Credit will be _____, 1989, to be automatically renewed annually *in its full original amount of USD 750,000.—* with a final expiry on July _____, 1996 at _____.

(emphasis in original).

On September 19, 1989, Henry sent a letter to Farnan which stated the following:

Provident Bank of Maryland agrees as follows with regard to our obligations under Standby Letter of Credit No. 99205 and in conformity with our commitment dated July 21, 1989:

"If you should draw on us your interest draft as set forth the amount of $750,000 shall be reavailable to you upon your receipt of our tested telex or amendment provided this Letter of Credit shall not have terminated."

Paragraph two (2) of our letter dated August 30, 1989 is hereby deleted and omitted.

Farnan apparently sent a copy of the letter immediately to BDS, for BDS responded on September 20, 1989, by sending another telefax to Farnan:

We thank you for the amendment proposed by Provident Bank of Maryland with respect to the stand-by L/C. We wish that the engagement of Provident Bank of Maryland to reestablish yearly the amount of the stand-by L/C at USD 750,000.—was clearly stated as an engagement conditional only to the final validity of the stand-by L/C. We then wish to see written by Provident the amendment in the following way:

"If you should draw on us your interest draft as set forth the amount of USD 750,000.—shall be reavailable to you upon your receipt of our tested telex or amendment that we unconditionally engage to send you yearly provided this Letter of Credit shall not have terminated."

Henry then sent another letter to Farnan on September 21, 1989, which purported to be in reference to the "Side Letter Dated August 30, 1989" and an "Amendment Dated September 19, 1989:"

Provident Bank of Maryland stands by its original commitment dated July 21, 1989. Therefore we were not, and remain not concerned about the side letter amendment that you requested through Rock Solid Investments dated September 19, 1989. We committed to that language and we sent you the change immediately.

We understand that you are not asking for an amendment to the Letter of Credit. However, our letters are just as binding to us as our paper. In view of the ambiguous language of your last requested change which could be construed to change the transaction terms from those *already* agreed to, or is redundant or similar to the letter which I issued upon your request dated September 19, 1989, we *cannot* comply. We have remained faithful to our original commitment which bears the language that *your* company requested.

We have issued your approved Letter of Credit and commitment. We have followed your instructions to the smallest detail. We trust that you will disburse this loan according to the new disbursement schedule, a copy of which is enclosed.

(emphasis in original). The letter closed by asking Suriel to confirm by telefax the disbursement date of the RSI/Suriel loan.

As mentioned earlier, the BDS/Suriel loan agreement required Suriel to transfer to BDS its rights as beneficiary to draw upon the Provident LOC. On September 26, 1989, Suriel sent an executed copy of a Manufacturers transfer form to Manufacturers purporting to irrevocably transfer to BDS all rights that Suriel as beneficiary had to draw under what was identified as letter of credit U169123. In pertinent part, the transfer form provided:

By this transfer, all rights of the undersigned beneficiary in such Letter of Credit are transferred to the transferee and the transferee shall have the sole rights relating to any amendments whether increases or extensions or other amendments and whether now existing or hereafter made. All amendments are to be advised direct to the transferee without necessity of any consent of or notice to the undersigned beneficiary.

The transfer form sent to Manufacturers made no mention whatsoever of letter of credit 99205, the Provident LOC.

The next letter from Henry to Farnan, dated September 26, 1989, replaced the language quoted in the letter of September 19, 1989, with the following text:

"If you should draw on us your interest draft as set forth, the amount of $750,000 shall be automatically reavailable to you upon your receipt of our tested telex or amendment provided this Letter of Credit shall not have terminated."

The letter also provided that the letter "supercedes [sic] and replaces" the letter of September 19, 1989. As with the earlier letters from Henry, it appears that Farnan transmitted a copy of the September 26 letter to BDS for its review. On September 27, 1989, BDS telefaxed a letter to Farnan which asked her to get a confirmation from Provident that " 'authomatically renewable' means that it will be renewed yearly for its amount without beeing subordinated to any events or actions [sic]." The next day, BDS again telefaxed a letter to Farnan asking her to obtain a confirmation from Provident that

the wording utilised by them in the amendment of the stand by l/c, really means what both of us think, that is, that "authomatically reavailable" really means that the authomatism is not subject to any condition but the final validity, and therefore that it is their irrevocable intention to issue yearly the telex confirming the reavailability of the full amount of the l/c [sic].

Henry then wrote to Farnan on September 29, 1989, and provided the following warranty to Suriel:

Provident Bank of Maryland hereby warrants that the undertakings set forth in our Letter of Credit No. 99205, and our August 30, 1989 and September 26 Agreements are not subject to any new conditions except the final maturity and expiration and shall be honored accordingly by the Provident Bank of Maryland.

On October 11, 1989, Manufacturers responded to the transfer by Suriel on September 26, 1989, and sent notice to BDS of Suriel's transfer of its rights, making refer-

ence to "Letter of Credit No. 99205 Issued by Provident Bank of Maryland" and "Manufacturers Hanover Trust Co. Advice No. U169123." The notice provided in pertinent part:

> At the request of Suriel Finance N.V. 301 West Maple Avenue Suite 100, Vienna, Virginia 22180 the beneficiary of the above letter of credit, we wish to advise you that we have received notice that all rights of the beneficiary to draw up to but not exceeding a sum of $750,000.00 under the above described letter of credit has been transferred to you by transfer dated September 26, 1989 under and subject to the terms and conditions of such transfer.

The notice also indicated that a copy of Suriel's transfer form and a copy of the notice were sent to Henry at Provident.

On October 27, 1989, Henry advised Manufacturers that RSI had received funds pursuant to the RSI/Suriel loan. Manufacturers then issued Amendment No. 502 to the Provident LOC on November 7, 1989, which permitted drawings under the letter of credit. The amendment listed BDS under the heading for beneficiary.

When the first interest payment came due on the RSI/Suriel loan, RSI did not have the resources to make the payment. Eager to avoid missing the first interest payment, Douglass asked Henry to release a portion of the collateral RSI had deposited with Provident in order to make the first payment to Suriel. Henry consented, and released collateral to RSI to make the first interest payment. According to Douglass, the idea for using the collateral to make the payment was Farnan's. Later, Henry again released collateral so that RSI could make several more interest payments. The released collateral was never replenished by RSI. Ultimately, Henry was fired by Provident for releasing the collateral.

During 1990, Manufacturers paid three draws presented by BDS as beneficiary of the Provident LOC. On April 25, 1990, Manufacturers honored a draw for $197,624.99 by BDS. On July 19, 1990, Manufacturers paid BDS $205,000. On October 16, 1990, Manufacturers paid $230,312.49 on a draw by BDS. However, on January 15, 1991, BDS presented a draw for $230,212.50, which Manufacturers refused to honor. BDS sent a telex to Manufacturers immediately, informing them that the letter of credit was automatically reavailable in the amount of $750,000 in the event that the first $750,000 was drawn down. Manufacturers immediately sent a reply telex informing BDS that the letter of credit did not allow for automatic reavailability and that only $117,062.52 remained available under the letter of credit. That same day BDS sent a letter to Provident asking that Provident instruct Manufacturers to honor the full amount of BDS' draw. Provident refused to instruct Manufacturers to honor the draw. BDS then presented a draw for the remaining balance, which Manufacturers paid on January 23, 1991. Suriel notified RSI on January 23, 1991, that Provident had "elected not to return our original Letter of Credit which constitutes the collateral for the RSI loan" and that, consequently, RSI was in default.

BDS initiated this suit against Suriel and Provident on November 6, 1991, and filed a First Amended Complaint on June 9, 1992. BDS alleges in the first count of its amended complaint that Suriel breached the BDS/Suriel loan agreement by failing to make interest payments required under the loan. However, neither party has moved for summary judgment on this count. Moreover, Suriel has neither answered the complaint nor otherwise defended this action.

In the second, third and fourth counts of its amended complaint, BDS alleges, respectively, that Provident wrongfully dishonored, breached and anticipatorily breached its letter of credit. BDS contends that the Provident LOC "as amended" required Provident to make $750,000 available each year for seven years. Therefore, BDS asserts that Provident's refusal to honor drafts after $750,000 had been depleted was a wrongful dishonor, a breach and an anticipatory breach.

In the fifth count of its amended complaint, BDS alleges that Provident negligently represented to BDS that the Provident LOC would be "automatically and unconditionally renewable and reavailable in the

amount of $750,000 per year each year for seven years." In the sixth count of its amended complaint, BDS seeks a declaratory judgment that "the Provident LOC as amended is automatically and unconditionally renewable for a period of seven years in its full amount" of $750,000. Finally, BDS alleges in the seventh count of its complaint that Provident intentionally and fraudulently deceived BDS by creating documentation designed to make BDS believe that the Provident LOC would be automatically and unconditionally renewable for a period of seven years in its full amount of $750,000.

Provident moved for summary judgment on counts two through seven on August 10, 1992. Provident bases its case for summary judgment on the wrongful dishonor, breach, and anticipatory breach claims on three main grounds. First, Provident asserts that BDS' rights are limited to the rights it received from Suriel by transfer of the Manufacturers confirmation, which indisputably is not revolving. That is, Provident contends that Suriel transferred its rights only under what Provident characterizes as a separate Manufacturers commitment, not the Provident LOC.

Second, Provident contends that letters issued by Henry to Farnan after the issuance of the Provident LOC were not "amendments" to the Provident LOC, as BDS contends, but were merely "side letters" which did not affect its letter of credit in any way. Provident contends that its position is correct both as a matter of law and a matter of fact. As a matter of law, Provident asserts that under the Uniform Customs and Practice for Documentary Credits ("UCP") any amendment to a letter of credit must be confirmed by the confirming bank if one is involved in the transaction. In the present case, Provident points out that Manufacturers never confirmed, or even knew about, the letters which BDS claims were amendments to the Provident LOC. Factually, Provident contends that the parties never intended for the letters to amend the Provident LOC.

As its third ground, Provident contends that even if the letters from Henry to Farnan were amendments, the letters did not amend the Provident LOC so that $750,000 would be automatically and unconditionally reavailable each year for seven years. Rather, Provident asserts that the reavailability of $750,000 was subject to a condition, recollateralization. Provident also contends that any ambiguity in the language of a purported "amendment" must be construed against Suriel, and through Suriel against BDS, as drafter of the language.

Finally, Provident contends that BDS' fraud and negligent misrepresentation claims fail because Provident never communicated with BDS or knew of BDS' role in the transaction at the time that the relevant documents in this case were issued. Further, Provident contends that as a matter of law BDS cannot maintain a negligent representation action against Provident because Maryland does not recognize a claim for negligent misrepresentation for economic loss in a commercial transaction.

## II

Under Rule 56 of the Federal Rules of Civil Procedure, a motion for summary judgment can only be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 883–84, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990). Summary judgment is not appropriate unless, viewing the possible inferences in a light most favorable to the nonmoving party, no reasonable jury could return a verdict in its favor. *Helm v. Western Maryland Railway Co.,* 838 F.2d 729, 734 (4th Cir.1988); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court must ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–52, 106 S.Ct. at 2512. It should also be noted that in the Fourth Circuit the standard for summary judgment is strict, and that summary judgment is inappropriate even if merely the inferences to be drawn from the facts are in dispute. *Morrison v. Nissan Motor Co.,* 601 F.2d 139, 141 (4th Cir.1979).

Nonetheless, when a motion for summary judgment has been made and supported, Rule 56(e) provides that an adverse party may not rest upon mere allegations or denials of the adverse party's pleading, but must set forth specific facts showing that there is a genuine issue for trial. The mere existence of a scintilla of evidence is insufficient. Rather, there must be evidence from which the trier of fact could reasonably find for the nonmoving party. *Anderson,* 477 U.S. at 251, 106 S.Ct. at 2511. In the absence of such a minimal showing, the moving party should not be required to undergo the considerable expense of preparing for and participating in a trial.

### III

Before proceeding to a substantive analysis, the Court finds that it must address several preliminary issues necessary to the ultimate resolution of the pending motion for summary judgment. First, the Court must determine the substantive law applicable to this case. Because the Court's subject matter jurisdiction is based on diversity of citizenship, the Court must look to the conflict of laws rules of the forum state—Maryland— to determine the substantive law applicable to this action. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Court observes that the letter of credit at issue in this case is, in essence, a contract. Maryland follows the rule of *lex loci contractus* and applies the law of the place of making of the contract in cases involving the validity and construction of contracts. *See Bethlehem Steel v. G.C. Zarnas & Co.,* 304 Md. 183, 188, 498 A.2d

605, 607 (1985). The place of making of a contract is the place where the last act necessary to complete the contract and give it validity was performed. *See Keco Industries v. ACF Industries,* 316 F.2d 513, 514 (4th Cir.1963). In the present case, the last act necessary to give validity to the Provident LOC was its issuance by Provident in Maryland on September 11, 1989.[3] Accordingly, the conflict of laws rules of Maryland dictate that the substantive law of Maryland governs this dispute.

Maryland has enacted a version of the Uniform Commercial Code, including those sections governing letters of credit. *See* Md. Com.Law Code Ann. §§ 5–101 to 5–117 (1992). However, like any provision of the UCC, the provisions of the UCC governing letters of credit can be varied by agreement of the parties. Md.Com.Law Code Ann. § 1–102(3) (1992). In this case, both the Provident LOC and the Manufacturers confirmation provide that those documents are "subject to" the UCP. Provident and BDS, however, dispute the force with which provisions of the UCP apply to this case.

BDS contends that the provisions of the UCP are not mandatory, but merely evidence of custom and usage in letter of credit practice. Provident contends that UCP provisions govern the issues in this case with the force of law. The Court finds that, by themselves, the provisions of the UCP are not law but merely a record of custom. However, when the UCP is incorporated into a letter of credit, its provisions become part of the terms of the agreement. In that respect, the UCP is mandatory and has the force of law in that agreement.[4] Section 1–

---

3. *See also* Burton V. McCullough, *Letters of Credit* § 2.04, at 2–21 (1993) ("Issues regarding letters of credit are generally resolved by reference to the law of the jurisdiction where the issuing or confirming bank is located and performance by it is to take place.").

4. This view is in accord with the views taken by leading commentators on letter of credit law. Harfield explains that the UCP influences letters of credit in two ways:

First, issuers of credits, predominantly banks, ordinarily specify that the credit is "subject to" the UCP, thus, in effect, incorporating [the UCP] in the instrument. On this basis the provisions of the UCP become terms

of the credit contract in the same manner as those terms that explicitly describe the obligee and the conditions on which funds will be available.

Second, the UCP represent a convenient and reasonably comprehensible record of custom and usage. This is not to say that the UCP have the force of law; manifestly, they do not. Their provisions are mandatory only in the sense that, by reference, they are incorporated into a letter of credit transaction. When, however, in the context of any dispute, proof of custom is relevant, the UCP stand as a record of normal expectations.

Henry Harfield, *Letters of Credit* at 3–4 (1979). McCullough expresses a similar view:

102(3) of the Commercial Law Article explicitly allows parties to a letter of credit to vary or go beyond the provisions of the UCP. Md.Com.Law Code Ann. § 1–102(3) (1992). Accordingly, the Court finds that in the present case the UCP governs the present case with the force of law.

■■■ Provident and BDS also dispute the manner in which the Court is to interpret the effect of UCP provisions. BDS contends that the meaning of any applicable UCP provisions is an issue of fact and has offered the affidavit of Professor James E. Byrne as to their interpretation of the meaning and operation of UCP provisions. Because Provident has not offered any expert testimony, BDS contends that for this reason alone Provident is unable to meet its burden of proof for summary judgment. Provident, on the other hand, contends that the Court should not consider expert testimony as to the meaning of UCP provisions but should apply the provisions on their face. Because the Court views the provisions of the UCP as terms of the letter of credit similar to other terms, the Court finds that normal principles of interpretation under the UCC apply. Under the UCC, usage of trade is always available to "give particular meaning to and supplement or qualify terms of an agreement." Md.Com.

> Where the letter of credit expressly incorporates the U.C.P., it can be treated as an "agreement otherwise" under the [UCC], thus varying the effect of the provisions of the [UCC]. In addition, incorporation of the [UCP] may also be considered an agreement setting the standards by which performance is judged.
> Burton V. McCullough, *Letters of Credit* § 2.05[2], at 2–37 (1993).

5. Related concepts under the UCC are course of dealing and course of performance. However, course of dealing requires a sequence of previous conduct between the parties not present in the instant case. *See* Md.Com.Law Code Ann. § 1–205(1) (1992). Course of performance, on the other hand, is an Article 2 (Sales) concept inapplicable to a transaction under Article 5 (Letters of Credit). *See* Md.Com.Law Code Ann. § 2–208 (1992).

6. BDS relied on three cases at the hearing to support its position that interpretation of the UCP is an issue of fact requiring expert testimony. *See Torco Oil Co. v. Innovative Thermal Co.,* 763 F.Supp. 1445 (N.D.Ill.1991); *AMF Head Sports Wear, Inc. v. Ray Scott's All–American Sports Club, Inc.,* 448 F.Supp. 222 (D.Ariz.1978);

Law Code Ann. § 1–205(3) (1992).[5] Section 1–205(2) provides:

> A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. If it is established that such a usage is embodied in a written trade code or similar writing the interpretation of the writing is for the court.

Md.Com.Law Code Ann. § 1–205(2) (1992). This provision makes clear that the interpretation of the UCP, which indisputably is a written record of custom and usage, is a matter for the Court and not dependent upon expert testimony. Furthermore, § 1–205(4) makes clear that the express terms of an agreement control when those express terms and usage of trade cannot reasonably be construed as consistent with each other. Md.Com.Law Code Ann. § 1–205(4) (1992). Therefore, the Court will consider Professor Byrne's testimony and the express terms of the UCP in ascertaining relevant usage of trade. However, interpretation of particular UCP provisions is a matter for the Court and not dependent upon Professor Byrne's testimony.[6]

*Elmer v. Morgan Guaranty Trust Co. of New York,* No. 80 Civ. 2145 (EW) (S.D.N.Y. Nov. 18, 1981). The Court finds that none of the three cases cited support the position that BDS maintains.

In *Torco Oil,* the issue before the court was whether a "standby" letter of credit complied with a contractual requirement that one of the parties provide the other with a "documentary" letter of credit in connection with a contract to purchase natural gas. 763 F.Supp. at 1448. During a jury trial of the issue, both sides called expert witnesses, including Professor Byrne. *Id.* However, resolution of the issue did not require interpretation of a UCP provision that had been incorporated into a letter of credit. Rather, the issue turned on the definition of "documentary" letter of credit in the industry. Interestingly, in denying motions to upset the jury's finding that a standby letter of credit was indeed a documentary letter of credit, Circuit Judge Posner (sitting by designation in the trial court) implied that Professor Byrne's view of documentary credits was at odds with Article 1 of the UCP. *Id.* at 1449.

Likewise, in *AMF Head Sports Wear,* the issue before the court was not whether interpretation

Finally, the Court notes that BDS in its amended complaint asserts three separate claims—wrongful dishonor, breach of the letter of credit, and anticipatory breach of the letter of credit—that appear to involve precisely the same underlying facts: Provident's refusal to honor BDS' draw under the Provident LOC on January 16, 1991. The Court observes that Harfield treats "wrongful dishonor" and "breach of contract" as one and the same in the letter of credit context: "wrongful dishonor constitutes a breach of contract that is actionable at the instance of the aggrieved party." Henry Harfield, *Letters of Credit* 59 (1979). Furthermore, § 5–115 of the Commercial Law Article provides a remedy only for wrongful dishonor or anticipatory repudiation, making no mention of breach of contract.[7] For the purposes of this summary judgment motion, the Court will construe the second, third and fourth counts of BDS' amended complaint as alleging claims of wrongful dishonor and anticipatory repudiation.

## IV

### A

In order for BDS to ultimately prevail on its claims, it must first show that it has rights under the Provident LOC. BDS was not a party to the Provident LOC when it was issued. However, BDS contends that it has full rights in the Provident LOC—which it contends provides for annual reavailability of $750,000 for seven years—by virtue of a transfer by Suriel of all of Suriel's rights as beneficiary under the Provident LOC. In support of this position, BDS has submitted the Manufacturers transfer form that was executed by Suriel on September 26, 1989.

During this litigation, the characterization of the document issued by Manufacturers, number U169123, by both BDS and Provident has varied. In both its initial complaint and its amended complaint, BDS viewed U169123 as a letter of credit issued by Manufacturers for one year, referring to it as the "MHT LOC." Later, in its opposition to the motion for summary judgment, BDS changed its view and instead characterized U169123 as a one-year confirmation by Manufacturers, not a letter of credit. Likewise, in its papers in support of summary judgment, Provident initially referred to U169123 as a letter of credit issued by Manufacturers. At the hearing and afterwards, new counsel for Provident seemingly have also taken the position that U169123 is a one-year confirmation of the Provident LOC and not a letter of credit itself.

---

of a UCP provision incorporated into a letter of credit required expert testimony. Instead, before the court was an issue of banking custom and usage. 448 F.Supp. at 224. The defendant introduced expert testimony and the UCP itself as evidence of banking custom and usage. *Id.* The court found irrelevant the plaintiff's argument that the UCP was not incorporated into the letter of credit. *Id.* Patently, this case does not support BDS' position, for it did not involve the interpretation of the UCP as incorporated into a letter of credit.

*Elmer,* on the other hand, did involve interpretation of a letter of credit that incorporated the UCP. The court in *Elmer* heard expert testimony on the meaning of Article 36 of the UCP. Slip op. at 18 (LEXIS pagination). However, the Court finds *Elmer* distinguishable from the present case. In *Elmer,* the court found that Article 36 did not apply *on its face* to a letter of credit involving a service contract. *Id.* at 17–18. Accordingly, the decision of the court in *Elmer* to hear expert testimony on the meaning of Article 36 in no way supports BDS' blanket assertion that the Court must consider expert testimony on the meaning of UCP provisions in every circumstance.

7. Section 5–115 provides:

(1) When an issuer wrongfully dishonors a draft or demand for payment presented under a credit the person entitled to honor has with respect to any documents the rights of a person in the position of a seller (§ 2–707) and may recover from the issuer the face amount of the draft or demand together with incidental damages under § 2–710 on seller's incidental damages and interest but less any amount realized by resale or other use or disposition of the subject matter of the transaction. . . .

(2) When an issuer wrongfully cancels or otherwise repudiates a credit before presentment of a draft or demand for payment drawn under it the beneficiary has the rights of a seller after anticipatory repudiation by the buyer under § 2–610 if he learns of the repudiation in time reasonably to avoid procurement of the required documents. Otherwise the beneficiary has an immediate right of action for wrongful dishonor.

Md.Com.Law Code Ann. § 5–115 (1992).

This issue has some significance in that Provident contends that Suriel only transferred to BDS its rights under the Manufacturers confirmation and not its rights under the Provident LOC. Provident bases this position on the text of the September 26, 1989, transfer form sent to Manufacturers by Suriel. Notably, the text only makes reference to U169123 and not to 99205, the Provident LOC. Further, Provident contends that, by addressing a transfer request to Manufacturers, Suriel could have transferred only the one-year confirmation by Manufacturers. Provident bases this view on Article 54(a) of the UCP, which provides:

> A transferable credit is a credit under which the beneficiary has the right to request the bank called upon to effect payment . . . to make the credit available in whole or in part to one or more other parties (second beneficiaries).

U.C.P. art. 54(a) (1983). Because Manufacturers was called upon to make payments under its confirmation for one year only, Provident contends that Manufacturers only could have transferred Suriel's rights to BDS for one year.

BDS disputes the notion that a confirmation of a letter of credit can be transferred independently of the letter of credit itself. Instead, BDS reads Article 54(a) to allow full transfer of a letter of credit by either the issuing bank or the confirming bank. The Court is unaware of any UCP provision, or any other authority, addressing the transfer of a confirmation independent of the transfer of the letter of credit. While the Court recognizes the seeming logic of Provident's position that a confirming bank can only transfer a letter of credit to the extent that it has confirmed the letter of credit, the Court is not prepared to find that the language of Article 54(a) compels this position. Consequently, for the purposes of summary judgment, the Court accepts BDS' contention that Manufacturers could have transferred Suriel's rights as the beneficiary under the Provident LOC in their entirety to BDS.

The acceptance of that position does not imply that the Court finds that BDS was transferred the rights as beneficiary that it claims under the Provident LOC. For even if the Court assumes for the moment the ultimate issue in this case—that the Provident LOC provided for annual reavailability of $750,000 for seven years—it is clear from the record that Manufacturers transferred something less than what BDS claims. In the notice of transfer dated October 11, 1989, Manufacturers stated:

> we wish to advise you that we have received notice that *all rights of the beneficiary to draw up to but not exceeding a sum of $750,000.00* under the above described letter of credit has been transferred to you by transfer dated September 26, 1989 under and subject to the terms and conditions of such transfer.

(emphasis added). Thus, even if the Provident LOC did provide for annual reavailability of $750,000 for seven years, and even if Manufacturers had the power to transfer the entire Provident LOC, it is clear that Manufacturers only transferred the right of Suriel to draw up to but not exceeding a sum of $750,000 under the Provident LOC, regardless of whether the Provident LOC provided for more. There is no evidence in the record that BDS objected at any time after the notice of transfer was sent by Manufacturers on October 11, 1989. Accordingly, the Court cannot find that BDS is the transferee of any of Suriel's rights under the Provident LOC beyond the $750,000 which indisputably has been paid by Provident. Consequently, because the Court finds that BDS has no standing to maintain its wrongful dishonor and anticipatory repudiation claims, it must grant the motion for summary judgment in this respect.

Normally, such a finding would forestall discussion by the Court of remaining issues concerning BDS' wrongful dishonor and anticipatory repudiation claims. However, the Court is well aware of the extremely complex nature of this case and finds it prudent to provide a complete discussion of all the issues involved. Therefore, the Court will discuss the remaining issues, even though its finding on the standing issue alone would ordinarily be enough to eliminate any further discussion.

## B

Even assuming that BDS was transferred Suriel's full rights under the Provident LOC without limitation by Manufacturers, the Court's analysis of the issue of transfer is not complete. The main thrust of BDS' claims in this litigation is that the letters sent by Henry to Farnan on September 19, 1989, and September 26, 1989, amended the Provident LOC with the effect of providing for annual reavailability. For BDS' claims to stand, these letters must have been amendments to the Provident LOC, number 99205. However, it is clear that those letters do not refer to 99205, but refer instead to the letter sent by Henry to Farnan on August 30, 1989.

Henry viewed the August 30 letter not as a letter of credit but as a "side letter." In the September 21, 1989, letter to Farnan, Henry distinctly described the August 30 letter as a "side letter" and as a commitment different from the Provident LOC. Further, in the September 21 letter Henry referred to September 19, 1989, amendment letter as the "side letter amendment" and emphasized: "We understand that you are not asking for an amendment to the Letter of Credit." From the record the Court must conclude that the parties did not regard the August 30 letter as part of the Provident LOC but as a separate, "side letter" commitment.[8]

BDS seems to recognize that the August 30 letter was not part of the Provident LOC. Indeed, BDS offers the opinion of Professor Byrne for the proposition that the August 30 letter was a "pre-advice," which is issued in order to provide the applicant and beneficiary assurance regarding the terms of the letter of credit. Byrne asserts that the issuer becomes obligated to issue a letter of credit on the same terms as the pre-advice. Byrne concedes that this view is based on his understanding of a provision contained in a later version of the UCP, but contends nevertheless that Article 12(a) of the UCP version applicable here provided for an identical obligation. The Court, however, can find no mention of "pre-advice" in Article 12 or any other UCP article.

Even if the Court were to accept Professor Byrne's characterization of the August 30 letter, which it declines to do, such a characterization does not advance BDS' claims. First, nothing in the record indicates that BDS is the holder of Suriel's rights under the August 30 letter, whether it is a "pre-advice" or a "side letter." The only evidence of any kind of transfer in this transaction is the transfer form executed by Suriel on September 26, 1989. As mentioned earlier, this form refers solely to U169123, the Manufacturers confirmation.

Second, BDS has not based any of its claims on the August 30 letter. Instead, BDS bases all of its claims on its view that Provident wrongfully dishonored or otherwise breached the Provident LOC, number 99205. Nowhere has BDS brought a claim that Provident breached the August 30 "pre-advice" by failing to issue a letter of credit in conformity with the terms contained in that letter. Accordingly, the Court cannot find that the letters of September 19, 1989, and September 26, 1989, refer to the Provident LOC in any way that is of any legal moment to BDS' claims in this case.

## C

Even if the Court could find that the letters of September 19, 1989, and September 26, 1989, do in fact impact upon the Provident LOC, Provident contends that those letters fail to be amendments of the Provident LOC as a matter of law. Provident contends that, under Article 10(d) of the UCP, to be effective an amendment must be agreed to by the confirming bank if a confirming bank is involved in the transaction. Article 10(d) provides:

> Such undertakings [referring to irrevocable letters of credit] can neither be amended nor cancelled without the agreement of the issuing bank, the confirming bank (if

---

**8.** Suriel was represented throughout this transaction by Jean Farnan. However, in her deposition, Farnan refused to answer any substantive questions about any aspect of the transaction, citing her Fifth Amendment privilege against self-incrimination. Thus, the primary sources available to the Court in ascertaining the intent of the parties in this transaction are Henry's deposition testimony and the documentary evidence.

any), and the beneficiary. Partial acceptance of the amendments contained in one and the same advice of amendment is not effective without the agreement of all the above named parties.

U.C.P. art. 10(d) (1983). Because Manufacturers neither was advised of nor agreed to the aforementioned letters, Provident contends that those letters could not be valid amendments under Article 10(d).

BDS responds in two ways to this argument. First, BDS contends that the UCP is not mandatory but merely advisory and may be varied by the actions of the parties. Thus, BDS asserts that any requirement contained in Article 10(d) is not absolutely mandatory. However, the Court has rejected this argument because the Provident LOC expressly provided that it was subject to the UCP. Second, BDS maintains that any failure of the confirming bank to agree to an amendment does relieve the issuer's obligation if the issuer and beneficiary have agreed to the amendment. That is, BDS asserts that any lack of Manufacturers' agreement to the amendment letters in no way affects the obligation created by an agreement between Provident and Suriel. Further, BDS asserts that as a matter of policy Manufacturers' agreement to the amendment letters was unnecessary in that Manufacturers' confirmation was for one year only and the amendment letters affected changes over the entire seven year life of the Provident LOC.

The Court recognizes the logic of BDS' position. Logically, the failure of one party to agree to an amendment does not necessarily imply that the remaining parties, who have agreed to the amendment between themselves, should be relieved of their obligation. However, the Court finds that the express language of Article 10(d) dispels BDS' position. Although the second sentence of Article 10(d) is addressed to the problem of partial acceptance of amendments, analysis of this provision reveals the consequences of the parties' agreement to an amendment. It is clear from this portion of Article 10(d) that the agreement of all of the parties, including the confirming bank, to an amendment is necessary for the amendment

to be legally *effective*. That is, the amendment is a nullity without the agreement of the issuer, the beneficiary, and the confirming bank, if a confirming bank is involved in the transaction.

Maryland law compels the Court's reading of Article 10(d). In *Centennial Industries, Inc. v. Union Trust Company of Maryland,* 75 Md.App. 202, 212, 540 A.2d 1169, 1174 (Md.Ct.Spec.App.1988), *cert. denied,* 313 Md. 505, 545 A.2d 1343 (1988), one of the very few Maryland cases to mention the UCP at all, the Court of Special Appeals strictly construed a similar provision of the 1974 version of the UCP requiring the agreement of all parties for an amendment or cancellation of a letter of credit. Accordingly, the Court finds that a Maryland court would require strict compliance with Article 10(d) for an amendment to be effective.

Consequently, the Court finds that Article 10(d) of the UCP requires the full agreement of the issuer, the beneficiary and the confirming bank for an amendment to a letter of credit to be effective. In the present case, Manufacturers was not advised of the letters of September 19, 1989, and September 26, 1989. Thus, Manufacturers did not agree to or confirm the substance of those letters. Accordingly, those letters could not be effective amendments to the Provident LOC pursuant to Article 10(d) of the UCP.

### D

Even if the letters could have been valid amendments under the UCP, it does not necessarily follow that the letters were intended by the parties to be amendments to the Provident LOC. From the record, the only evidence of intent illustrates that the parties did not intend for the letters to be amendments. The letter dated September 21, 1989, from Henry to Farnan is strong evidence of the intent of the parties regarding the September 19 letter. Henry referred to the September 19 letter clearly as a "side letter amendment" and reiterated that Provident understood that Farnan was "not asking for an amendment to the Letter of Credit." There is no evidence in the record that it was the intent of the parties to amend the Provident LOC by means of these letters.

This conclusion is further buttressed by the parties' later action in formally amending the Provident LOC. On October 27, 1989, Henry advised Manufacturers that RSI had received funds pursuant to the RSI/Suriel loan. Manufacturers then issued Amendment No. 502 to the Provident LOC on November 7, 1989, which permitted drawings under the letter of credit. This action demonstrated that the parties were aware of the procedure for making valid amendments to the Provident LOC. Thus, if the parties had intended the letters of September 19, 1989, and September 26, 1989, to operate as amendments to the Provident LOC, it is likely that the parties would have complied with correct UCP procedure by seeking Manufacturers' assent. Accordingly, the Court cannot find that the parties intended the letters of September 19, 1989, and September 26, 1989, to be amendments to the Provident LOC.

## E

■ Even if the letters were intended to operate as amendments to the Provident LOC in regards to Provident and Suriel despite the lack of Manufacturers' assent or confirmation, BDS must show that the amendments altered the Provident LOC to provide for the annual reavailability of $750,-000. BDS contends that this conclusion is compelled by the textual changes in the Provident LOC effected by the two letters. The September 19, 1989, letter from Henry to Farnan stated the following:

Provident Bank of Maryland hereby agrees as follows with regard to our obligations under Standby Letter of Credit No. 99205 and in conformity with our commitment dated July 21, 1989:

"If you should draw on us your interest draft as set forth the amount of $750,000 shall be reavailable to you upon your receipt of our tested telex or amendment provided this Letter of Credit shall not have terminated."

Paragraph two (2) of our letter dated August 30, 1989 is hereby deleted and omitted.

Paragraph two of the August 30, 1989, letter from Henry to Farnan originally provided:

In the event Suriel must draw against the Standby Letter of Credit No. *99205* (L/C) issued by this Bank and confirmed by Manufacturers Hanover Trust Company of New York, this Bank will immediately amend the L/C to the original $750,000 credit available level without equivocation, upon receipt of the cash collateral restoring the reserve fund to $800,000.00, as specified in our letter dated July 21, 1989.

The September 26, 1989, letter from Henry to Farnan revised the text provided by the September 19 letter:

"If you should draw on us your interest draft as set forth, the amount of $750,000 shall be automatically reavailable to you upon your receipt of our tested telex or amendment provided this Letter of Credit shall not have terminated."

Through these textual changes, BDS contends that any requirement of recollateralization was deleted and the Provident LOC became a commitment providing for the availability of $750,000 each year for a total of seven years. BDS further asserts that the inclusion of "automatically reavailable" in the revised text removes any doubt that the letter of credit was intended by Suriel and Provident to provide $750,000 each year. for seven years subject to no conditions.

Provident contends that the revised text just as clearly demonstrates that reavailability was subject to a condition: the beneficiary's receipt of Provident's tested telex or amendment. Provident bases this contention not only on the language adopted by the parties but also on language suggested by BDS through Suriel but rejected by Provident. Shortly after the Provident LOC was issued, BDS initiated a series of communications with Suriel in order to obtain more favorable terms from Provident. BDS sent a telefax to Farnan on September 14, 1989, asking that the following language be inserted in the letter of credit:

The effective date of the Letter of Credit will be _____, 1989, to be automatically renewed annually *in its full original amount of USD 750,000.*—with a final expiry on July _____, 1996 at _____.

(emphasis in original). After Henry's letter of September 19, BDS sent another telefax to Farnan requesting yet another change in wording:

> We thank you for the amendment proposed by Provident Bank of Maryland with respect to the stand by l/c. We wish that the engagement of Provident Bank of Maryland to reestablish yearly the amount of the stand-by L/C at USD 750,000.—was clearly stated as an engagement conditional only to the final validity of the stand by L/C. We then wish to see written by Provident the amendment in the following way:
>
>> "If you should draw on us your interest draft as set forth the amount of USD 750,000.—shall be reavailable to you upon your receipt of our tested telex or amendment that we unconditionally engage to send you yearly provided this Letter of Credit shall not have terminated."

Henry then sent a letter to Farnan on September 21, 1989, in which he stated the following:

> In view of the ambiguous language of your last requested change which could be construed to change the transaction terms from those *already* agreed to, or is redundant or similar to the letter which I issued upon your request dated September 19, 1989, we *cannot* comply. We have remained faithful to our original commitment which bears the language that *your* company requested.

(emphasis in original).

Despite Henry's stance in the September 21 letter not to agree to further wording changes, Henry sent the September 26 letter to Farnan which, by its own terms, superseded the September 19 letter and inserted the term "automatically" into the previous revision. Again, BDS was not satisfied with the wording. In telefaxes dated September 27 and September 28, 1989, BDS requested Suriel to get a confirmation from Provident that " 'automatically renewable' means that it will be renewed yearly for its amount without being subordinated to any events or actions" and that "the wording utilised by them in the amendment of the stand by l/c, really means

what both of us think, that is, that "automatically reavailable" really means that the authomatism is not subject to any condition but the final validity, and therefore that it is their irrevocable intention to issue yearly the telex confirming the reavailability of the full amount of the l/c." Henry then wrote to Farnan on September 29, 1989, and provided the following warranty to Suriel:

> Provident Bank of Maryland hereby warrants that the undertakings set forth in our Letter of Credit No. 99205, and our August 30, 1989 and September 26 Agreements are not subject to any new conditions except the final maturity and expiration and shall be honored accordingly by the Provident Bank of Maryland.

No further textual changes or communications are evidenced in the record.

Provident contends that the foregoing series of communications illustrates that, although Provident agreed to the term "automatically reavailable," it nonetheless refused to make reavailability unconditional. Repeatedly, BDS requested that Provident include language clarifying that Provident would unconditionally send the telex or amendment and that the "authomatism" was subject to no condition other than final validity. Provident refused to incorporate such language. Indeed, in the September 21 letter to Farnan, Henry emphasized that Provident was not consenting to semantic changes that could be construed as affecting the terms of the transaction. The documentary evidence comports with Henry's deposition testimony that he understood Farnan to be requesting technical language changes only to please her superiors. It is clear that Provident did not intend that the reavailability of $750,000 be unconditional. As stated earlier, there is no evidence that Farnan had a different intent or that she faithfully transmitted BDS' concerns to Provident.

BDS relies heavily upon the use of "automatically" in the textual revision in support of its position that Provident was unconditionally obligated to make $750,000 available annually for seven years. The Court observes that, in the present case, "automatically" does not connote "unconditionally." This conclusion is demonstrated by an analysis of

evidence ignored by the parties. As the arguments of the parties have developed in this litigation, the Court has been troubled by both side's insistence that the Manufacturers confirmation was for one year only. The record belies this simple assertion. Manufacturers issued its confirmation on September 14, 1989. If Manufacturers' confirmation was for one year only, Manufacturers would have been no longer involved in the transaction after September 15, 1990. However, Manufacturers paid BDS' third draw under the Provident LOC on October 16, 1990, and denied BDS' attempted fourth draw on January 16, 1991. Clearly, Manufacturers considered the duration of its confirmation to be for greater than one year. As stated in its confirmation, Manufacturers agreed to the duration of its confirmation as follows:

> It is a condition of the confirmation of this Letter of Credit by Manufacturers Hanover Trust Company that such confirmation shall expire on September 15, 1990 but that its confirmation shall be automatically extended for additional periods of one year from the present of each future confirmation expiry date, however, in no event shall the expiry date of our confirmation be extended beyond the final expiry date of September 15, 1996, unless at least 45 days prior to such date Manufacturers Hanover Trust Co. notifies you ... that it elects not to renew its confirmation of this Letter of Credit for such additional periods....

Although Manufacturers referred to its confirmation as being "automatically extended" beyond the first year, it is clear that Manufacturers did not unconditionally agree to extend its confirmation. Implicitly, Manufacturers conditioned the automatic extension of its confirmation on its decision to remain involved in the transaction.

Likewise, the Court finds that Provident's obligation to provide automatic reavailability is conditioned on its sending of a tested telex or an amendment reestablishing $750,000. The September 26 letter provided expressly that "the amount of $750,000 shall be automatically reavailable to you upon your receipt of our tested telex or amendment." Although the above text does not specify on what condition the amendment would be given, the evidence in the record indicates that the amendment would be sent by Provident upon RSI's recollateralization of the Provident LOC in the event of depletion of the $750,000. First, the remainder of the August 30 letter not altered by the September 19 or September 26 letters makes clear that Provident required recollateralization in order to make $750,000 reavailable: "We hope that this letter serves Suriel's purpose in showing our commitment to revolve the L/C conditioned only upon receipt of the replenishing cash collateral." Further, Henry's letter of September 21 to Farnan makes clear that he understood that the language changes requested by Farnan did not alter the terms of the transaction previously agreed to by the parties.

The Court finds that Provident was not required under the Provident LOC to unconditionally reestablish $750,000 each year for seven years. The parties do not dispute that Provident did not issue a telex or amendment reestablishing $750,000 under the Provident LOC. Nor do the parties dispute that RSI did not replenish the collateral required by Provident. Accordingly, the Court finds that Provident was not required to provide more than the $750,000 it paid in four draws to BDS.

### F

For each of the preceding reasons, the Court finds that BDS has failed to establish a genuine issue of material fact on its claims of wrongful dishonor and anticipatory repudiation. Provident is entitled to judgment as a matter of law on these counts. Accordingly, the Court will grant Provident's motion for summary judgment on BDS' wrongful dishonor and anticipatory repudiation claims.

### V

BDS has also alleged fraud and negligent misrepresentation by Provident in issuing documents which caused BDS to believe that Provident LOC would be annually and unconditionally renewable for a period of seven years in the amount of $750,000. Provident asserts that an action for negligent misrepresentation cannot arise in Maryland

out of a commercial transaction for purely economic loss. In order to maintain an action for negligent misrepresentation under Maryland law, a plaintiff must show

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Weisman v. Connors,* 312 Md. 428, 444, 540 A.2d 783, 791 (1988) (quoting *Martens Chevrolet, Inc. v. Seney,* 292 Md. 328, 337, 439 A.2d 534, 539 (1982)).

However, in *Flow Industries, Inc. v. Fields Construction Co.,* 683 F.Supp. 527 (D.Md.1988) (Motz, D.J.), this Court found that, under Maryland law, "if the risk created by negligent conduct is no greater than one of economic loss, generally no tort duty will be found absent a showing of privity or its equivalent." *Id.* at 529 (quoting *Jacques v. First National Bank,* 307 Md. 527, 537, 515 A.2d 756, 761 (1986)). The Court refused to find privity or its equivalent in a relationship deliberately structured by the parties to insulate each other. *Id.* Even if privity exists, the Court held that an action for negligent misrepresentation does not lie for economic losses caused by statements made during the course of a contractual relationship between businessmen. *Id.* at 530. The Court of Special Appeals of Maryland cited *Flow Industries* with approval in *Boatel Industries, Inc. v. Hester,* 77 Md.App. 284, 307, 550 A.2d 389, 401 (1988). *See also Blue Circle Atlantic, Inc. v. Falcon Materials, Inc.,* 760 F.Supp. 516, 519 (D.Md.1991) (Smalkin, D.J.); *Martin Marietta Corp. v. INTELSAT,* 763 F.Supp. 1327, 1331 (D.Md.1991) (Garbis, D.J.).

Recognizing the lack of privity between it and Provident, BDS contends that the equivalent of privity is satisfied because the Provident LOC was "freely negotiable and transferable on its face." While the Provident LOC was indeed transferable, it certainly was not a negotiable instrument under Maryland law. To be a negotiable instrument under Maryland law, the instrument must, among other things, "contain an unconditional promise to pay a sum certain in money and no other promise...." Md.Com. Law Code Ann. § 3–104(1)(b) (1992). The promise to pay under the Provident LOC was expressly conditioned upon RSI failing to meet its loan obligations under the RSI/Suriel loan. In any event, the Court does not find that transferability or negotiability imbues the BDS/Provident relationship with the equivalent of privity. The Court finds no appreciable difference in this context between a second beneficiary of a letter of credit and the assignee of a simple contract. Because of the lack of privity or its equivalent between BDS and Provident, the Court finds that BDS cannot maintain a claim for negligent misrepresentation against Provident under Maryland law. Even if the equivalent of privity in fact is present, BDS has at most alleged economic loss arising from negligent oral and written statements by Provident during the course of a commercial transaction. Statements in such a context do not give rise to a claim of negligent misrepresentation regardless of privity or its equivalent. *Flow Industries,* 683 F.Supp. at 530.

As to BDS' fraud claim, Provident contends that BDS cannot maintain an action for fraud against Provident because Provident did not know of or communicate with BDS at the time that the relevant documents in this case were created. In order to maintain a fraud action under Maryland law, a plaintiff must show that

(1) a false representation was made;

(2) the falsity was known to the speaker or the misrepresentation was made with reckless indifference to its truth;

(3) the misrepresentation was made for the purpose of defrauding the plaintiff;

(4) the plaintiff relied on the misrepresentation, had a right to rely on it, and would not have done the thing from which the injury resulted if the misrepresentation had not been made; and

(5) the plaintiff suffered loss or injury by reason of the misrepresentation.

*Smith v. Rosenthal Toyota, Inc.,* 83 Md.App. 55, 60, 573 A.2d 418, 421 (Md.Ct. Spec.App.1990) (citing *Everett v. Baltimore Gas & Electric Co.,* 307 Md. 286, 300, 513 A.2d 882, 889 (1986)). Further, the standard of proof for fraud is clear and convincing evidence. *Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 466, 601 A.2d 633, 655–56 (1992). The Supreme Court has held that the clear and convincing evidence standard should be taken into account in ruling on summary judgment motions in cases that involve that burden of proof. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986) (libel burden of proof).

BDS has failed to show by clear and convincing evidence that the alleged misrepresentations made by Provident were made for the purpose of defrauding BDS. No evidence in the record indicates that Provident knew or should have suspected that BDS would at some time become a beneficiary of the Provident LOC. During the negotiations preceding and immediately following the issuance of the Provident LOC, BDS dealt only with Suriel and did not communicate with Provident. There is no evidence that Suriel informed Provident that it was required to transfer to BDS its rights as beneficiary under the Provident LOC. BDS also asserts that Provident knew of BDS as a beneficiary because Henry received a copy of the Manufacturers notice of transfer dated October 11, 1989. However, all of the documentation that BDS contends constituted misrepresentations were created by Provident *before* October 11, 1989. Any representations made by Provident were made to Suriel without knowledge that BDS would be succeeding Suriel as beneficiary under the Provident LOC. Thus, BDS has failed to show that any representations made by Provident were made for the purpose of defrauding BDS.

Accordingly, the Court will grant Provident's motion for summary judgment on BDS' negligent misrepresentation and fraud claims.

## VI

For all of the foregoing reasons, the Court will grant the Motion for Summary Judgment filed by defendant Provident. A formal Order will be entered in conformity with this Memorandum Opinion.