540 A.2d 1169

**CENTENNIAL INDUSTRIES, INC.**

v.

**UNION TRUST COMPANY OF MARYLAND.**

**No. 1345, Sept. Term, 1987.**

Court of Special Appeals of Maryland.

May 10, 1988.

Certiorari Denied Aug. 29, 1988.

Jeffrey C. Hines, Baltimore, for appellant.

John H. Culver, III (Miles & Stockbridge, on the brief), Baltimore, for appellee.

Argued before BISHOP and ROSALYN B. BELL, JJ., and JAMES S. GETTY, Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

JAMES S. GETTY, Judge, Specially Assigned.

This is an appeal by Centennial Industries, Inc., from a denial of its motion to vacate a confessed judgment, in the

amount of $50,000.00, obtained by Union Trust Company of Maryland. Intertwined in this question are issues of good faith dealing between parties, meritorious defenses and the commercial vitality and function of letters of credit. We begin with a factual recitation of the transactions between the parties.

In 1984 Centennial was engaged as a contractor by the United States Department of Agriculture (U.S.D.A.) for the purpose of supplying the government with soybean oil. Initially, Centennial acted as a broker, purchasing the oil from various suppliers who processed and shipped it as directed. In June, 1986, Centennial leased a packaging facility located in Georgia which enabled it to process and package soybean oil thereby maximizing its profit.

In order to finance the purchases of soybean oil from suppliers, Centennial entered into a "Commercial Letter of Credit Agreement and Security Agreement" with Union Trust. With each contract awarded Centennial by the U.S. D.A., the proceeds were assigned to Union Trust and the latter would issue a letter of credit for the benefit of the particular suppliers. Once the contract had been fulfilled, Union Trust would pay the supplier, deduct any loans and fees due and remit the balance to Centennial. The loan amount, $50,000 in this case, was start-up money enabling Centennial to begin processing the purchases received from the suppliers of soybean oil.

One of the documentary requirements set forth in the letters of credit issued by Union Trust was the inclusion of a Federal Grain Inspection Certificate required by the U.S. D.A. before Union Trust's payment was forthcoming. When Centennial was acting as a broker, the inspection certificate was obtained by the supplier since no other party dealt with the finished product. After Centennial began its own packaging, the suppliers delivered the oil to Centennial's packaging plant in Georgia for processing. Under this arrangement, Centennial became the final handler of the packaged oil and, as such, it was required to obtain the

inspection certificate since the U.S.D.A. required that the last processor obtain the certificate.

Despite the fact that Centennial was no longer acting solely as a broker, the letters of credit it requested and those issued by Union Trust included a requirement that the suppliers submit the inspection certificate "to be obtained by Centennial." This the suppliers refused to do, contending, with some justification, that they were no longer processing oil, but selling oil in bulk to Centennial and they were entitled to be paid on delivery, not at some later date when Centennial completed the operation. Thereafter, Centennial requested that Union Trust amend the letters of credit to satisfy the objections raised by the suppliers. The request was refused.

The $50,000 promissory note involved in this case arose from a $1,022,000 contract awarded Centennial by the U.S. D.A. on August 26, 1986. Union Trust advanced $50,000 as working capital needed by Centennial to fulfill the contract. Prior to the entry of the confessed judgment, Centennial obtained two additional contracts for delivery of 8,335,419 pounds of soybean oil between October 1, 1986 and December 5, 1986. Union Trust, as a result thereof, increased Centennial's line of credit to $1.7 million per month. The value of the outstanding contracts was $2,000,000. One of these contracts generated a letter of credit issued to Archer Daniels Midland Company dated September 25, 1986, requiring the supplier, Archer Daniels, to submit a "Federal Grain Inspection Service Certificate (to be supplied by Centennial Industries) in duplicate." Contending that it had no ability to control the obtention of the certificate once the material left its plant, Archer Daniels refused to provide the oil. According to Centennial all other suppliers contacted refused to provide oil to Centennial subject to the same terms contained in the letter of credit issued by Union Trust to Archer Daniels. On November 16, 1986, Union Trust filed a Notice of Entry of Judgment by Confession for the $50,000 previously advanced. Centennial countered with a Motion

to Vacate Judgment supported by an affidavit from its President, Robert Fenner, alleging that it had a meritorious defense to Union Trust's claim. The motion was denied by the Circuit Court for Howard County (Nissel, J.) and this appeal followed.

Centennial raises two issues, namely:

1. In a confessed judgment suit filed by a bank, where a defendant alleges that the bank breached its duty of good faith, did the court properly consider the allegations of the defendant in determining if they raised a meritorious defense or counterclaim, applying the lesson of *Robert Anthony Jacques v. First National Bank of Maryland,* 307 Md. 527 [515 A.2d 756] (1986)?

2. Does the obligation of good faith, imposed on a bank in its relationship with a loan customer, apply to the benefit of a borrower, under a line of credit and a letter of credit arrangement?

Union Trust views the issue as whether Centennial alleged facts sufficient to establish a cause of action against Union Trust for breach of contract entitling it to vacate the judgment by confession. We shall address the issues as stated by Centennial.

In his affidavit alleging a meritorious defense, Mr. Fenner describes the history of the business relationship between Union Trust and Centennial. The first two contracts amounted to approximately 275,000 pounds of soybean oil for a total price of approximately $70,000. Centennial acted as a broker and, according to the affidavit, Union Trust forwarded an amended letter of credit in order to correct several "documentary discrepancies." Fenner also alleges that contract executions were underway with three or four other named vegetable oil producers and that (unspecified) modifications were made in letters of credit by either meetings or telephone conversations with Union Trust personnel, specifically Ms. Mitzie Holmes–Dempsey, Vice President in

charge of business development.[1]

By the end of September, according to the affidavit, all of the letters of credit had been issued for the $2,000,000 purchase of soybean oil, modifications were made in the letters of credit relating to the purchase of boxes and cans, but the suppliers of oil would not accept the requirement that they supply the certificate of inspection.

Fenner alleges a pattern and practice between Centennial and the bank of correcting documentation discrepancies after the issuance of the letters of credit. He concludes his affidavit by setting forth the alternatives he suggested to resolve the dilemma; they include:

1.  An offer to provide an inspector at Centennial's expense to certify the quality of the oil prior to receipt.
2.  A guarantee of quality as to government standards.
3.  Recognition by Union Trust that a U.S.D.A. inspector was on the premises of the packaging plant in Georgia.
4.  Recognition by Union Trust that it had 45 days after shipment to render payment and any defect would be apparent within that time frame.

Fenner then states his intention to sue Union Trust for $14,000,000.

At the hearing on the Motion to Vacate Confessed Judgment no testimony was offered other than Fenner's affidavit. The trial judge held that Centennial did not establish facts sufficient to create a *prima facie* claim and was not, therefore, entitled to vacate the judgment by confession.

### *The Law*

■ Maryland Rule of Civil Procedure 2–611(d) establishes the standard governing the vacating of a confessed judgment. It states:

---

1.  Ms. Holmes–Dempsey left the bank prior to the obtaining of the $50,000 confessed judgment.

[I]f the court finds that there is a substantial and sufficient basis for an actual controversy as to the merits, the court shall order the judgment by confession opened....

In *Murray v. Steinmann,* 29 Md.App. 551, 349 A.2d 447 (1975), we said:

[T]he burden of proof to vacate a confessed judgment is not fulfilled by the mere assertion of a defense. There must be sufficient evidence to persuade the fair and reasoned judgment of an ordinary man ... that there are substantial and sufficient grounds for an actual controversy as to the merits of the case.

If, however, the evidence is such that persons of ordinary judgment and prudence could fairly draw different inferences from it, the controversy should not be decided as a matter of law, but instead should be submitted to a trier of fact. *Stankovich v. Lehman,* 230 Md. 426, 187 A.2d 309 (1963).

■ Centennial argues that an obligation of good faith is imposed upon any financial institution that enters into a lending arrangement with a borrower, citing *Jacques, supra.* It also contends that the principles concerning letters of credit do not apply, because this is simply a lending relationship and a lender's breach of a duty to lend money. Despite its efforts to distance itself from the letters of credit, Centennial argues that the bank was obliged to amend the letters to satisfy the suppliers and its refusal was a breach of its good faith obligation.

In *Jacques, supra,* the purchasers of a home applied for a mortgage loan through First National Bank. The bank advised the purchasers that they qualified for a loan of $74,000 rather than the $112,000 requested and the loan figure was later reduced to $41,400. The bank was later sued for the economic loss sustained by the purchasers in obtaining alternate financing and the Court of Appeals held that a tort duty of reasonable care in processing the application for the loan existed where contractual privity existed between the bank and the applicants.

We have no quarrel with the results reached in *Jacques* or in *Chew v. Meyer*, 72 Md.App. 132, 527 A.2d 828 (1987), another case recognizing that a contractual obligation arising from the "intimate nexus" of the relationship may give rise to a tort duty to act reasonably in fulfilling whatever obligation has been undertaken.[2] We disagree, however, with Centennial's argument that these cases are dispositive of the issues presented in the present case.

The contract between Centennial and Union Trust was not created in a vacuum. The letters of credit were the very foundation upon which the entire enterprise rested. Without the funding provided by Union Trust, or some other issuer through letters of credit, there would have been no contracts for soybean oil. In deciding whether any tort was committed or any contract was violated by Union Trust, we must examine the particular agreement between Centennial and Union Trust as well as the nature of letters of credit. We shall discuss the two in inverse order.

Maryland Code (1975) Title 5 of the Commercial Law Article, sec. 5–103(1)(a), defines a letter of credit as:

an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this title (sec. 5–102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. A credit may be either revocable or irrevocable. The engagement may be either an agreement to honor or a statement that the bank or other person is authorized to honor.[3]

Letters of credit, typically, play a role in three separate and distinct contracts. Those contracts, while functionally

---

**2.** In *Chew*, a physician agreed to submit a form to a patient's employer that would explain the reasons for the patient's absence from work. This form was not forwarded within a reasonable time and the patient was fired.

**3.** For a discussion of the historical background of letters of credit, *see Mercantile Safe Deposit and Trust Company v. Baltimore County*, 309 Md. 668, 526 A.2d 591 (1987) (opinion by Murphy, Chief Judge).

related, containing elements of an overall transaction, are separate and distinct from one another as a matter of law. H. Harfield, *Bank Credits and Acceptances*, (5th ed. 1974). The contracts are:

1. The first contract is one between the issuing bank (Union Trust) and its customer (Centennial) relating to the issuance of the letter and its content.

2. A second contract exists between the issuing bank and a beneficiary, ordinarily the seller of goods (Archer Daniels).

3. The third contract is the sales contract between the seller and the buyer (Archer Daniels–Centennial).

The rationale for holding that the letter of credit transaction between the issuer and the seller is independent of the underlying commercial transaction between the customer-buyer and the seller is the protection of the latter. Thus, a letter of credit pledging the bank's credit, regardless of what transpires between the buyer and seller in their transaction, assures the seller that payment is guaranteed. *See Mercantile Safe Deposit, supra.* Section 5–114(1) in Title 5 of the Uniform Commercial Code provides:

An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary.

With that brief discussion of the nature of letters of credit, we turn to the terms of the agreement between Union Trust and Centennial. The Commercial Letter of Credit Agreement and Security Agreement between Union Trust and Centennial states in paragraph 4.1 that Centennial:

[A]grees that any action taken by [Union Trust] or by any correspondent of [Union Trust] under or in connection with the credit or the relative drafts, demands, documents or property, if taken in good faith shall be binding on [Centennial Industries] and shall not put [Union Trust] or

its correspondents under any resulting liability to [Centennial Industries] and [Centennial Industries] makes the agreement as to any action or omission unless in breach of good faith.

Paragraph 9.6 of the document states:

This agreement and each [Letter of] Credit issued hereunder shall be subject to the Uniform Customs and Practice for Documentary Credits (1974 Revision) and International Chamber of Commerce Publication No. 290, and any subsequent official revisions thereof or amendments thereto which are adhered to by [Union Trust], and shall be governed by the laws of the State of Maryland in all respects, including matters of construction, validity and performance, and none of these terms and provisions may be waived, altered, modified, or amended, except in writing, duly signed for and on behalf of [Union Trust].

Article 3(c) of the Uniform Customs and Practice for Documentary Credits regulations, referred to above, states explicitly that an irrevocable letter of credit "can neither be amended nor cancelled without the agreement of all parties thereto." Additionally, the Application for Irrevocable Commercial Letter of Credit submitted by Centennial to Union Trust for the various contracts contains the following language in the first paragraph thereof:

The undersigned (the "Applicant," whether one or more than one) hereby requests Union Trust Company of Maryland (the "bank") to issue for the account of the Applicant an irrevocable commercial letter of credit in accordance with this Application for Irrevocable Letter of Credit (this "Application") and to transmit the same as indicated below (by check "X"). *In issuing the credit the Bank is expressly authorized to make such changes from the terms herein below set forth as the Bank, in its sole discretion, may deem advisable provided that no such change shall vary the principal terms thereof.* (Emphasis supplied.)

We think the "good faith" requirement set forth in paragraph 4.1 of the Letter of Credit Agreement is entirely

consistent with Title 5, sec. 5–109 of the Commercial Law Article entitled Letters of Credit. That section provides, in pertinent part, that:

(1) An issuer's obligation to its customer includes good faith and observance of any general banking usage, but unless otherwise agreed does not include liability or responsibility

(a) For performance of the underlying contract for sale or other transaction between the customer and the beneficiary; or ...

(c) Based on knowledge or lack of knowledge of any usage of any particular trade.

The official comment to 5–109 makes clear that the extent of the issuer's obligation to its customer is based upon the agreement between the two; that agreement is the bargain of the parties in fact.

Under paragraph 9.6 of the agreement between the parties, the Uniform Customs and Practice for Documentary Credits is applicable and, as we have pointed out, amendment or cancellation of the letter of credit requires the agreement of *all* the parties involved. Centennial, therefore, cannot unilaterally require Union Trust to accede to the modification it seeks. This conclusion is further supported by the provision in the Application for Irrevocable Commercial Letter of Credit granting exclusive authorization to Union Trust to change the terms of the credit as long as the principal terms are not varied.

It is important to note that Union Trust did not refuse to issue the letter of credit and Centennial does not dispute this fact. The letter of credit was issued in accordance with the terms suggested by Centennial. After Centennial's customer, Archer Daniels, refused to accept the credit, Centennial insisted that Union Trust was somehow obligated to concur in an amendment for the benefit of the seller. As we have pointed out, Centennial's demand is contrary to the terms of the agreement with Union Trust and relates to a different contract—the contract between the buyer (Centennial) and the seller (Archer Daniels).

Centennial's argument that Union Trust had previously consented to documentary amendments is not controlling in that those changes occurred in transactions where the letters of credit had already been accepted by the seller. Here, the credit expired because it was not accepted in the first instance and, therefore, no contract existed.

Centennial's claim that Union Trust was required to amend is also contrary to law. In *AMF Head Sports Wear v. Ray Scott's All–American Sports Club*, 448 F.Supp. 222 (D.Arizona 1978), the Court held that because the contract between the customer and the bank did not obligate the bank to modify a letter of credit, neither the issuer's obligation of good faith nor commercial custom required the issuer to modify the letter of credit. AMF, the seller, expecting payment through American Bank's letter of credit, shipped goods to Ray Scott in Indiana rather than Arizona as required by the terms of the letter of credit. The bank, having reservations about Scott's ability to pay for the goods, refused to honor the letter of credit, giving as its reason AMF's failure to conform with the term requiring delivery in Arizona. The bank also refused to amend the letter. The Court recognized the inequity in permitting the bank to rescue itself from its own poor judgment in extending credit to an allegedly risky customer, but concluded:

> If the Court were to impose a duty to amend a letter of credit upon an issuer or bank, then future issuers of letters of credit would be faced with guessing whether a court, in hindsight, would require it to issue an amended letter of credit.

In *Dubose Steel, Inc. v. Branch Banking and Trust Company*, 72 N.C.App. 598, 324 S.E.2d 859, *rev. denied*, 314 N.C. 115, 332 S.E.2d 480 (1985), the bank refused payment on a letter of credit it issued to a seller for the purchase of steel, the reason for the refusal being a change in purchase orders negotiated between the buyer and the seller. The Court held that the bank was not required either to seek or consent to a waiver of the terms of the

original invoice set forth in the letter of credit. The bank was entitled to summary judgment as a matter of law in the absence of any genuine issue of material fact.

In the case *sub judice* there is no evidence of bad faith on the part of Union Trust, Centennial raised no issue of material fact sufficient to constitute a cognizable defense to the judgment by confession, and the trial court correctly denied Centennial's Motion to Vacate the Confessed Judgment. Regrettably, the action by Union Trust was disastrous for Centennial. The commercial vitality and function of letters of credit, however, compel the result we have reached.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.