**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BANCA DEL SEMPIONE,
Plaintiff-Appellant,

v.

PROVIDENT BANK OF MARYLAND,
Defendant-Appellee,

and

SURIEL FINANCE N.V.,

No. 94-2276

Defendant,

JEANNE FARNAN,
Party in Interest.

UNITED STATES COUNCIL ON
INTERNATIONAL BANKING,
INCORPORATED,
Amicus Curiae.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Walter E. Black, Jr., Senior District Judge.
(CA-91-3179-B)

Argued: June 9, 1995

Decided: February 14, 1996

Before LUTTIG and WILLIAMS, Circuit Judges, and BUTZNER,
Senior Circuit Judge.

_____

Reversed and remanded by published opinion. Senior Judge Butzner
wrote the opinion, in which Judge Luttig and Judge Williams joined.

## COUNSEL

**ARGUED:** Warren Lewis Dennis, PROSKAUER, ROSE, GOETZ & MENDELSOHN, Washington, D.C., for Appellant. James Meriweather Smith, GEBHARDT & SMITH, Baltimore, Maryland, for Appellee. **ON BRIEF:** Alec W. Farr, Thomas H. Brock, PROSKAUER, ROSE, GOETZ & MENDELSOHN, Washington, D.C., for Appellant. James T. Heidelbach, GEBHARDT & SMITH, Baltimore, Maryland, for Appellee. Richard A. Lash, BUONASSISSI, HENNING, CAMPBELL & MOFFETT, P.C., Fairfax, Virginia; William F. Connell, CONNELL & TAYLOR, New York, New York, for Amicus Curiae.

_____

## OPINION

BUTZNER, Senior Circuit Judge:

Banca del Sempione (BDS) appeals a summary judgment entered in favor of Provident Bank of Maryland in this diversity action. The controversy between the parties arises out of the terms of a letter of credit (LOC) that Provident issued. The district court held that BDS lacked standing, and it identified additional reasons for its grant of summary judgment. See Banca Del Sempione v. Suriel Finance, N.V. and Provident Bank, 852 F. Supp. 417 (D. Md. 1994).

Because we conclude that BDS had standing and that the record discloses genuine issues of material fact, we reverse the judgment of the district court and remand the case for further proceedings.

For the purpose of this brief introduction, a bare bones outline of the transaction will suffice. We will advert to details as we discuss the issues.

Provident's customer, Rock Solid Investments, Ltd. (RSI), borrowed funds from Suriel Finance, N.V. Their loan agreement required RSI to obtain a LOC securing interest payments for seven years.

Provident issued a standby LOC naming Suriel beneficiary to secure RSI's interest payments for one year.

2

Manufacturers Hanover Trust Co. confirmed the Provident LOC for one year.

Suriel borrowed the funds needed for the RSI loan from BDS.

Provident wrote several letters to Suriel. A critical issue is whether these letters amended the LOC to make it automatically renewable annually for seven years, as BDS contends, or whether they simply constituted a side agreement that did not amend the LOC, as Provident contends.

At the request of Suriel, Manufacturers transferred the Provident LOC to BDS.

Manufacturers honored several drawings under the LOC, but at Provident's direction, it dishonored a subsequent drawing that was in excess of the amount confirmed.

After Provident refused to pay under its LOC, BDS brought this action.

I

Appellate review of a summary judgment requires an examination of the record before the district court to determine de novo that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Shaw v. Stroud, 13 F.3d 791, 798 (4th Cir. 1994). The evidence and all reasonable inferences from the evidence must be viewed in the light most favorable to the nonmoving party. If a party fails to show an essential element of the case for which that party has the burden of proof, summary judgment is appropriate. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The parties agree that Maryland law governs this case. In accordance with Md. Code Ann. Com. Law § 5-103(4) (1992), Article 5 must be read in conjunction with Article 1 of the General Provisions of the Maryland Uniform Commercial Code. As § 1-102(3) permits, Provident made its LOC, and Manufacturers made its confirmation,

3

subject to the Uniform Customs and Practices for Documentary Credits (1983 Revision International Chamber of Commerce Publication 400) (UCP). The UCP is not law. Nor does it have the force of law. Henry Harfield, <u>Letters of Credit</u> 3-4 (1979). As its name implies, the UCP is a code or compilation of the usage of trade pertaining to letters of credit. It stands "as a record of normal expectations." <u>Id</u>. at 4. Its use and interpretation are governed by Md. Code Ann. Com. Law § 1-205(2), which provides: "The existence and scope of [the] usage [of trade] are to be proved as facts." If the usage is "embodied in a written trade code or similar writing the interpretation of the writing is for the court." Like any fact, the meaning of the UCP and the usage of the trade can be proved by any person qualified to address the subject, including an expert witness.

The official comment to Md. Code Ann. Com. Law § 1-205 cautions against the "lay-dictionary" and the"conveyancer's" reading of a commercial document. Instead, the meaning of a document must be determined by the language the parties used and their actions in the context of commercial practices.

II

As the primary ground for granting summary judgment, the district court found that BDS did not have standing to allege wrongful dishonor or anticipatory repudiation. <u>See</u> 852 F. Supp. at 429-30.

In order to establish standing, BDS must prove an injury in fact, a causal connection between the injury and Provident's acts, and a likelihood that a favorable decision would redress the injury. <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992). Section 5-115, Md. Code Ann. Com. Law, aids BDS by recognizing that improper dishonor and anticipatory repudiation are injurious and by providing a monetary remedy.

The first inquiry in reviewing summary judgment on the issue of standing is whether BDS failed to establish that Provident amended its LOC to provide a credit for seven years. Resolution of this question depends on ascertaining the intent of the parties.

4

The loan agreement between RSI and Suriel required RSI to obtain a standby LOC for $750,000 as security for the annual interest on the loan. The agreement, dated July 6, 1989, provided that the LOC must be irrevocable and transferable, in an amount not less than $750,000, "annually renewable automatically" as security for interest payments. One can draw a reasonable inference that Samuel Henry, a vice-president of Provident, knew the requirements of the LOC stipulated in the Suriel-RSI loan agreement. This inference is based primarily on Henry's letter of August 30, 1989, in which he refers to the loan agreement. Suriel's loan agreement with BDS required Suriel to obtain a similar LOC to secure Suriel's interest payments.

On July 21, 1989, Henry sent a commitment letter to RSI for a LOC naming Suriel as beneficiary and requiring RSI to maintain $800,000 on deposit at Provident as collateral. The attached draft of the LOC was for $750,000 "to be automatically renewed annually" for seven years.

In August, Provident arranged for Manufacturers Hanover Trust to be the confirming bank of the LOC.

On August 30, 1989, Henry sent Suriel a letter which provided in paragraph 2:

> In the event Suriel must draw against the Standby Letter of Credit No. 99205 (L/C) issued by this Bank and confirmed by Manufacturers Hanover Trust Company of New York, this Bank will immediately amend the L/C to the original $750,000 credit available level without equivocation, upon receipt of the cash collateral restoring the reserve fund to $800,000.00, as specified in our letter dated July 21, 1989.

The district court's opinion quotes the August 30 letter. 852 F. Supp. at 421 n.2.

On September 11, Provident issued its transferable, irrevocable LOC No. 99205 in the amount of $750,000. The LOC did not mention the provisions of paragraph 2 of Provident's letter of August 30, 1989. It provided that the LOC would expire on September 15, 1996.

5

On September 14, Manufacturers added its confirmation, number U169123, to the LOC for a period of one year to expire on September 15, 1990. Manufacturers' advice of confirmation stated:

> Notwithstanding anything to the contrary hereinbefore stated, if this letter of credit is in existence after the expiration of Manufacturers Hanover Trust Company's confirmation of this letter of credit, then this letter of credit is available with Provident Bank of Maryland by payment against presentation of the documents detailed herein accompanied by your drafts at sight drawn on Provident Bank of Maryland. No mention of Manufacturers Hanover Trust Company's advice number U169123 need be made in the documents detailed herein.

Manufacturers' advice of confirmation quoted the Provident LOC. The text of the advice of confirmation, including the LOC, is reproduced in the district court's opinion. 852 F. Supp. at 421-23. Manufacturers sent a copy of its advice of confirmation, including the LOC, to Suriel and to BDS, which was Suriel's advising bank.

After receiving from Suriel Provident's letter of August 30 and the terms of the LOC quoted in Manufacturers' advice of confirmation, BDS objected to paragraph 2 of the August 30 letter, which made recollaterization a condition precedent to the LOC revolving annually in the full amount. BDS also objected to the failure of the LOC to provide unequivocally for automatic annual renewal of the LOC in the full amount for seven years. BDS stated these objections to Suriel, which passed them on to Provident.

In response to BDS's objections, which Suriel voiced, Henry wrote a letter on September 19 to Suriel, which stated:"If you should draw on us your interest draft as set forth the amount of $750,000 shall be reavailable to you upon your receipt of our tested telex or amendment provided this Letter of Credit shall not have terminated." The letter also deleted paragraph 2 of the August 30 letter, thereby eliminating the provision that made recollaterization a condition precedent to the LOC revolving in the full amount.

On September 20, BDS informed Suriel that it objected to Provident's September 19 letter and that the amendment should expressly

6

state Provident's engagement to make the $750,000 renewable upon receipt of a tested telex or amendment which Provident unconditionally would send each year provided the LOC had not terminated.

On September 21, Henry responded to Suriel's request as follows:

> RE: Side Letter Dated August 30, 1989
> Amendment Dated September 19, 1989
>
> Provident Bank of Maryland stands by its original commitment dated July 21, 1989. Therefore we were not, and remain not concerned about the side letter amendment that you requested through Rock Solid Investments dated September 19, 1989. We committed to that language and we sent you the change immediately.
>
> We understand that you are not asking for an amendment to the Letter of Credit. However, our letters are just as binding to us as our paper. In view of the ambiguous language of your last requested change which could be construed to change the transaction terms from those already agreed to, or is redundant or similar to the letter which I issued upon your request dated September 19, 1989, we cannot comply. We have remained faithful to our original commitment which bears the language that your company requested.

(emphasis in original).

Nevertheless, on September 26, Henry wrote Suriel:

> RE: Standby Letter of Credit No. 99205
>
> Provident Bank of Maryland hereby agrees as follows with regard to our obligations under Standby Letter of Credit No. 99205 and in conformity with our commitment dated July 21, 1989:
>
> "If you should draw on us your interest draft as set forth, the amount of $750,000 shall be automati-

7

cally reavailable to you upon your receipt of our tested telex or amendment provided this Letter of Credit shall not have terminated."

Paragraph two (2) of our letter dated August 30, 1989 is hereby deleted and omitted. This letter supercedes and replaces the letter from me dated September 19, 1989.

On September 27, 1989, BDS sent a request to Suriel for "a confirmation that `automatically renewable' means that it will be renewed yearly for its amount without being subordinated to any events or actions."

On September 29, Provident sent a letter to Suriel referencing "Standby Letter of Credit No. 99205," and stating:

Provident Bank of Maryland hereby warrants that the undertakings set forth in our Letter of Credit No. 99205, and our August 30, 1989 and September 26 Agreements are not subject to any new conditions except the final maturity and expiration and shall be honored accordingly by the Provident Bank of Maryland.

Roberto Franchi, the BDS banker who was involved with the acceptance of the LOC, testified that he was satisfied that this language was the equivalent of the change he had requested because it confirmed that there were no other conditions on the renewal of the LOC. Also, Franchi, having investigated Provident's financial standing, decided to accept Provident's LOC even if Manufacturers did not extend its confirmation.

On September 26, Suriel requested Manufacturers to transfer all of its rights as beneficiary to BDS. On October 11, Manufacturers issued its advice of transfer.

On October 19, BDS, which had become the beneficiary, disbursed the proceeds of the BDS-Suriel loan to Suriel. Thereafter, Suriel released funds to RSI pursuant to their loan agreement. On October 27, 1989, Henry advised Manufacturers that RSI had received the pro-

8

ceeds of the Suriel-RSI loan. Manufacturers then issued Amendment No. 502, which permitted drawings under the LOC. The amendment named BDS as the beneficiary.

When the first interest payment came due, RSI was unable to make the payment. At RSI's request, Henry released part of the RSI collateral so that RSI could make its first interest payment. On subsequent occasions, Henry again released collateral to enable RSI to make interest payments. Henry did not advise BDS or Suriel that Provident was releasing the collateral, and RSI never replenished it.

Ultimately, RSI was unable to meet its interest obligations. When RSI defaulted on its interest payments, Suriel also failed to make its interest payments due under the BDS-Suriel loan. BDS accordingly submitted three drafts to Manufacturers under the LOC. Manufacturers paid these drafts in full: $197,624.99 on April 25, 1990; $205,000.00 on July 19, 1990; and $230,312.49 on October 16, 1990; for a total of $632,937.48. On January 16, 1991, BDS submitted another draft to Manufacturers for $230,312.50. At the direction of Mr. Thomas A. Crossland, a vice-president at Provident, Manufacturers refused payment in full. Eventually Provident fired Henry.

III

The parties disagree about the nature of Henry's letters. Provident contends that the letters did not amend the LOC and that they constituted a side agreement. The district court granted summary judgment to Provident on this issue. See 852 F. Supp. at 431. In support of the summary judgment, Provident asserts that the September letters related to the August 30 letter and not to the LOC. It calls attention to Henry's reference in his September 21 letter to the August 30 letter as a side letter, and it describes the September 19 letter as a side letter amendment. It emphasizes that in his September 21 letter, Henry wrote to Suriel: "We understand that you are not asking for an amendment to the Letter of Credit." In this connection, Provident points out that Henry's October 27 letter, which noted that RSI had received the loan proceeds, was admittedly an amendment. Provident sent this letter, unlike the September letters, to Manufacturers.

BDS contends that whether Henry's letters amended the LOC depends on the intent of the parties. As evidence showing that the let-

9

ters were amendments, it highlights Henry's reference in the September 26 and 29 letters, "RE: Standby Letter of Credit No. 99205." BDS also points out that the October 27 letter, which Provident admits was an amendment, also referred to Provident's LOC 99205. Henry's letters also mirror the October 27 letter in their format: the operative paragraph of the letters was set forth in block style separate from the rest of the text.

Franchi testified that BDS was concerned with paragraph 2 of the August 30 letter because it made the LOC conditioned on the renewal of RSI's deposit. This was a condition that BDS would not accept. BDS would not have made the loan to Suriel if this condition remained. Franchi pointed out that Provident expressly "deleted and omitted" this requirement in its letter of September 26. In this respect he was reassured by Provident's letter of September 29, which although referring to the August 30 letter, also referred to the September 26 letter that had deleted the objectionable paragraph 2. Franchi refers to the provisions in Henry's letter of September 26 as an amendment to the LOC.

Franchi viewed Henry's letters as irrevocably committing Provident to issue the tested telex on a yearly basis because the September 26 letter made $750,000 "automatically reavailable."

BDS and Provident also differ about the meaning of the word "automatically" in the context of this transaction. BDS asserts that it is synonymous with "unconditional" and that Provident lacked discretion to refuse to send a tested telex except upon the expiration of the LOC in 1996. Provident contends that "automatically" preserves the condition of RSI's annual replenishment of collateral. Since no tested telex was ever sent, Provident asserts that its liability is limited to $750,000.

BDS is supported by Professor James E. Byrne, chairman of the joint ABA/U.S. Council on International Banking Task Force on the Revision of Article 5 of the U.C.C., whom the court accepted as an expert. Byrne averred that the letters of September 26 and 29 constituted amendments to the LOC. He expressed the opinion that the phrase "automatically reavailable" in the September 26 letter changed the sending of a tested telex "from a precondition to the reavailability

10

of the credit subject to Provident's discretion to an action which must be done `automatically.'"

In sharp conflict with Byrne's and Franchi's testimony, Henry testified that the September 26 letter said "basically the same thing" as paragraph 2 of the August 30 letter.

Eric Lee Douglass, an officer of RSI, contradicted Henry's assertion that renewal of the collateral survived as a condition of the LOC. In his deposition, Douglass testified that in the beginning Provident required the collateral to be replenished. He also testified that the requirement to renew the collateral eventually was nullified. Provident claims, however, that Douglass was talking about a proposed transaction with Signet Bank. For the purpose of summary judgment, one must draw an inference from the context of Douglass's deposition that he was referring to the Provident LOC.

Also, for the purpose of summary judgment, one can conclude that Douglass's testimony is corroborated by Henry's actions. In his letter of September 26, Henry "deleted and omitted" the provision in paragraph 2 about renewal of the collateral. In addition, Henry disbursed large sums of the collateral without replenishment several times.

Ronald H. Carback, an officer of Provident Bank, testified in his deposition that Provident would not permit the LOC to be in excess of the collateral. With respect to Henry's letters, he testified:

> I can only say to you that basically the letters in question are trying to clarify the situation as to whether this Letter of Credit remained at seven hundred and fifty thousand dollars or whether, in the true sense of the Letter of Credit as it was originally written, it would be decreased by the amount drawn. I also must say that I'm not sure whether it's accomplished that. I don't understand, looking from the letters, you know, what has been clarified by this. I know that it was our intent to allow them, or to allow the Letter of Credit to remain at seven hundred and fifty thousand dollars provided that certain conditions on our part were met or that the, you know, the collateral that we had was not diminished below the eight hundred thousand dollars. This, if anything, makes

11

it even muddier than it was before. I'm not sure what this is saying.

The LOC is ambiguous when read in the light of Henry's letters, which may, or may not, constitute amendments. Moreover, this ambiguity cannot be resolved by extrinsic evidence. Henry's insistence that his letter of September 26 imposes the same conditions as paragraph 2 of his letter of August 30 is contradicted by his deletion of this paragraph, by his release of collateral, and by Douglass's testimony. Carback's deposition demonstrates that Provident recognized that Henry's letters did not clarify the ambiguity of the LOC. His testimony that the transaction was "even muddier than it was before" is an apt description of ambiguity.

An ambiguous contract that cannot be resolved by credible, unambiguous, extrinsic evidence discloses genuine issues of material fact. In this event, summary judgment is inappropriate. See World-Wide Rights Ltd. Partnership v. Combe, Inc., 955 F.2d 242, 245 (4th Cir. 1992).

Application of these principles in the context of letters of credit is illustrated by Banque Paribas v. Hamilton Industries Int'l, Inc., 767 F.2d 380 (7th Cir. 1985), and Timber Falling Consultants, Inc. v. General Bank, 751 F. Supp. 179 (D. Or. 1990). In Banque Paribas, the Seventh Circuit reversed a summary judgment that was based on an ambiguous guarantee and a letter of credit that was ambiguous about inclusion of the guarantee. In Timber Falling Consultants, the district court held that summary judgment was inappropriate when evidence was ambiguous concerning whether a letter of credit provided for automatic revolution at stated times or conditional revolution.

Summary judgment is inappropriate because Henry's letters and acts, together with testimony of Franchi, Byrne, Douglass, and Carback, disclose genuine issues of material fact making Provident's LOC ambiguous.

IV

The district court, relying on Article 10(d) of the UCP and giving it the force of law, also held that, as a matter of law, Henry's Septem-

12

ber letters could not be considered effective amendments of the UCP because Manufacturers had not consented to any amendments. See 852 F. Supp. at 431-32.

Article 10(d) must be read in the context of pertinent parts of Article 10 as follows:

> a. An irrevocable credit constitutes a definite undertaking of the issuing bank, provided that the stipulated documents are presented and that the terms and conditions of the credit are complied with . . .

> b. When an issuing bank authorizes or requests another bank to confirm its irrevocable credit and the latter has added its confirmation, such confirmation constitutes a definite undertaking of such bank (the confirming bank), in addition to that of the issuing bank . . . .

\* \* \*

> d. Such undertakings can neither be amended nor canceled without the agreement of the issuing bank, the confirming bank (if any), and the beneficiary.

Paragraph b. explains that confirmation is an "undertaking." Paragraph d. explains that "such undertakings" cannot be amended without the agreement of the confirming bank. Manufacturers' undertaking was a one-year confirmation. BDS does not claim that Henry's letters amended Manufacturers' undertaking, and, consequently, there was no amendment for Manufacturers to either accept or reject. Its obligation was not affected by paragraph d.

This commonsense reading of pertinent parts of Article 10 is reflected in the usage of the trade. An example is found in Manufacturers' advice of confirmation, which provided in part that if the LOC is in existence after Manufacturers' confirmation expires, credit is available from Provident under its LOC No. 99205 without mentioning Manufacturers advice No. U169123. See Part II of this opinion quoting the pertinent paragraph of Manufacturers' advice. Speaking

13

of this provision in Manufacturers' advice, Henry explained its purposes as follows:

> A. My recollection of the reason for that statement was the fact that the actual confirmation of the letter of credit was for a specific period of time which ran under the full period of time of the letter of credit that we issued. So that was just to cover in the event that for whatever reason Manufacturers Hanover ended up not confirming the letter of credit at some point in the future, that it didn't continue to specify Manufacturers Hanover as being its counters[sic, probably "confirmer"] during the entire time of the letter of credit.

> Q. So that Provident's obligation under 99205 for whatever period of time that it existed, was separate from Manufacturers obligation under its confirmation, is that correct?

> A. That's correct.

In his deposition, Henry also explained that he did not send his August and September letters to Manufacturers because he knew that Manufacturers would not confirm "automatic reavailability."

The UCP is a formulation of standard international banking practice. In interpreting the UCP, courts must strive to ascertain the actual banking practice that the Customs embody. In this case, we are aided in our understanding of UCP Article 10 by expert testimony. For an example of a court's use of such testimony, see Alaska Textile Co. v. Chase Manhattan Bank, N.A., 982 F.2d 813, 819-20, 822 (2d Cir. 1992).

Professor Byrne gave his opinion on custom and practice in the letter of credit industry. He explained that an amendment consented to and advised by the issuer binds the issuer regardless of the confirmer's lack of consent. The United States Council on International Banking agrees with Byrne's views, stating: "[T]he understanding of the international banking operations community [is] that under the UCP an issuer is bound by any amendment it communicates to the

14

beneficiary independent of whether the confirmer (if any) has consented to that amendment." Amicus brief at 6.

Centennial Industries v. Union Trust Co., 75 Md. App. 202, 212, 540 A.2d 1169, 1174 (Md. Ct. Spec. App. 1988), upon which Provident and the district court rely, is not contrary to the interpretation of the UCP which we believe to be correct. That case did not involve a confirming bank. In its decision, the Maryland Court of Special Appeals held that a customer, for whom a bank had issued an LOC, could not compel the nonconsenting issuing bank to amend the LOC even if the beneficiary agreed with the customer. It was in this context that the court cited the 1974 version of the UCP, which, like the 1983 version, required the consent of all parties. The Maryland court had no occasion to address the question in the case before us.

We conclude that because the alleged amendments did not affect Manufacturers' one-year confirmation, their validity does not depend on Manufacturers' consent to them.

To reiterate, a confirming bank's undertaking is affected only by amendments to which it consents. An issuer's undertaking is affected by amendments that it issues. The issuer's independent undertaking is not affected by the confirming bank's lack of consent to the issuer's amendments that do not change the confirming bank's undertaking. Judgment in favor of Provident because Manufacturers did not consent to the alleged amendments is inappropriate. Because this issue depends on the interpretation of the UCP in the context of trade usage, its resolution is committed to the court and not to the trier of fact. Md. Code Ann., Com. Law § 1-205(2) (1992).

V

The district court held that judgment also was compelled as a matter of law because Manufacturers, in its role as the transferring bank, transferred from Suriel to BDS only Suriel's right to draw up to $750,000 under the Provident LOC. The district court reasoned that even if Henry's letters were amendments, and even if Manufacturers had the power to transfer all of Suriel's rights, Manufacturers' terms of advice limited the transfer to $750,000. See 852 F. Supp. at 429-30.

15

A LOC is transferable only when it is expressly designated as such. Md. Code Ann., Com. Law § 5-116(1); UCP Art. 54(b). The Provident LOC satisfied this requirement, providing:"[t]his Letter of Credit is transferable in its entirety." Article 54(a) of the UCP states that the beneficiary of a transferable credit has the "right" to have the credit transferred. Article 54(c) provides that the transferring bank is under no obligation to effect transfer "except to the extent and in the manner expressly consented to by such [transferring] bank." We must examine both Suriel's request for transfer and Manufacturers' advice of transfer to determine the extent of BDS's rights under the LOC.

Suriel's transfer evidenced a clear intent to transfer all of its rights associated with the LOC. On September 26, 1989, Suriel sent Manufacturers, the designated transferring bank, a standard form, furnished by Manufacturers, entitled "Form XXX203 for Full Transfer." The document was addressed to Manufacturers and bore its advice number U169123 as the credit that it had confirmed. Suriel's authorized officer signed it. The transfer stated:

> For value received, the undersigned beneficiary hereby irrevocably transfers to: Banca Del Sempione [address] all rights of the undersigned beneficiary to draw under the above Letter of credit in its entirety.

> By this transfer, all rights of the undersigned beneficiary in such Letter of Credit are transferred to the transferee and the transferee shall have the sole rights as beneficiary thereof, including sole rights relating to any amendments whether increases or extensions or other amendments and whether now existing or hereafter made. All amendments are to be advised direct to the transferee without necessity of any consent of or notice to the undersigned beneficiary.

> The advice of such Letter of Credit is returned herewith, and we ask you to endorse the transfer on the reverse hereof, and forward it direct to the transferee with your customary notice of transfer.

Manufacturers' form, which Suriel used, bore the notation: "(Transferred in its entirety--all amendments, including increases and

16

extensions, applicable to transferee)." The usage of the trade, as exemplified by Article 54(a), authorized Suriel to request this transfer.

On October 11, 1989, Manufacturers sent the following letter to BDS:

> RE: Letter of Credit No. 99205 Issued by Provident Bank of Maryland
> Manufacturers Hanover Trust Co. Advice No. U169123
>
> Gentlemen:
>
> At the request of Suriel Finance N.V. [address] the beneficiary of the above letter of credit, we wish to advise you that we have received notice that all rights of the beneficiary to draw up to but not exceeding a sum of $750,000.00 under the above described letter of credit has been transferred to you by transfer dated September 26, 1989 under and subject to the terms and conditions of such transfer.
>
> For your information there are enclosed:
>
> A. Copy of such transfer [that is, a copy of Suriel's transfer dated September 26].
>
> B. True and correct copy of Advice No. U169123 of such letter of credit bearing notation thereon of notice of transfer.

Manufacturers also notified Provident that BDS was now the beneficiary of the LOC.

In evaluating the advice of transfer sent by Manufacturers, we need to distinguish between Manufacturers' role as the confirming bank and Manufacturers' role as transferring bank. When Manufacturers confirmed the LOC on September 14, 1989, the LOC was for $750,000. At that time, the LOC was not revolving. Manufacturers

17

was not privy to Henry's September letters reflecting the subsequent negotiations that occurred between Provident and Suriel about the revolving nature of the LOC and the deletion of the $800,000 requirement of collateral. Accordingly, Manufacturers' reference to $750,000 in its advice of transfer must be viewed in light of its understanding that $750,000 constituted the full amount of the LOC that it had confirmed.

Manufacturers' advice of transfer stated that it was"under and subject to the terms and conditions of such transfer." It identified the transfer as the document Suriel executed on September 26, and it enclosed a copy with its advice. Suriel's transfer and Manufacturers' form, which Suriel used, both transferred in their entirety all of Suriel's rights in Provident's LOC, including all amendments "now existing or hereafter made" and all "extensions . .. applicable to transferee."

By requiring Suriel to request a transfer on a form that provided for the transfer of the LOC and all amendments, and by sending BDS a copy of Suriel's transfer, which encompassed all Suriel's rights pertaining to amendments, Manufacturers effectively advised BDS of the scope of the transfer. The transfer gave BDS the right in the first year to draw up to $750,000 under Manufacturers' confirmation and to have the benefit of all existing and future amendments to Provident's LOC.

Professor Byrne, the only expert to give an opinion on letters of credit and the usage of the trade, stated in his affidavit that the transfer actually took place on October 11, 1989, when Manufacturers issued its advice of transfer. By that time, Provident had issued its letters of September 26 and 29, which BDS contends amended the LOC. Byrne expressed the opinion that inasmuch as Provident had elected to send its letters containing the disputed amendments directly to Suriel, BDS's rights as transferee included Suriel's rights in the entire LOC, as amended, even though the amendments were not sent to Manufacturers.

BDS's position is consistent with the paragraph in Manufacturers' advice of confirmation that provided for credit from Provident without mentioning Manufacturers' advice if the LOC was in existence

18

after the expiration of Manufacturers' confirmation. This provision, which, according to Henry's deposition, was contemplated by Provident, implicitly demonstrates that Manufacturers and other parties to the transaction were aware that the beneficiary could receive rights created by amendments to the LOC that survived the expiration of Manufacturers' confirmation.

Provident's choice of sending the text of the amendments through Suriel did not deprive BDS of standing as a matter of law. Assuming, as did the district court, that Henry's letters amended the LOC, we conclude as a matter of law that the transfer was effective to convey to BDS Suriel's rights in the LOC as amended.

VI

BDS also alleged fraud and negligent misrepresentation causes of action. BDS claimed that Henry's letters either intentionally or negligently misled BDS into believing that $750,000 would be automatically reavailable under the LOC each year for seven years. Provident contends that there is no evidence that it made any intentional representations to BDS and that there is no evidence that it had any relationship or dealings with BDS that gave rise to a duty of care. Provident emphasizes that all of its dealings were with Suriel.

The district court granted summary judgment for Provident on the fraud claim because BDS did not show by clear and convincing evidence that Provident made misrepresentations to BDS in order to defraud BDS. The court found that there was "[n]o evidence in the record indicat[ing] that Provident knew or should have suspected that BDS would at some time become a beneficiary of the Provident LOC." 852 F. Supp. at 437. Provident's motion for summary judgment and the court's analysis make clear that the motion was granted because Provident dealt with Suriel and did not communicate with BDS.

We believe that the Maryland courts would not require Provident to have communicated with BDS in order to be held liable for fraud. Though the Maryland courts have not directly addressed the issue, the prevailing rule provides:

19

> The maker of a fraudulent misrepresentation is subject to
> liability for pecuniary loss to another who acts in justifiable
> reliance upon it if the misrepresentation, although not made
> directly to the other, is made to a third person and the maker
> intends or has reason to expect that its terms will be
> repeated or its substance communicated to the other, and
> that it will influence his conduct in the transaction or type
> of transaction involved.

Restatement (Second) of Torts § 533 (1977). Maryland courts "view each act in its setting, considering the implications and prompting of usage and fair dealing." L & P Converters, Inc. v. Alling & Cory Co., 100 Md. App. 563, 572, 642 A.2d 264, 268-69 (Md. Ct. Spec. App. 1994) (quoting Glanzer v. Shepard, 233 N.Y. 236, 240-41, 135 N.E. 275, 276 (1922)).

The primary purpose of a letter of credit is to support an engagement to pay money. Henry Harfield, Letters of Credit 1 (1979). The LOC facilitates an independent contractual relationship by assuring the beneficiary of payment. Since Provident and Suriel contracted for transferability, the LOC was transferable. Md. Code Ann., Com. Law § 5-116(1); see also UCP Art. 54(b). By making its LOC transferable in its entirety without provision to restrict the identity of the transferee, Provident knew or should have known that Suriel had the right to transfer the LOC to BDS even though Provident did not deal directly with BDS. For the purpose of summary judgment, we can draw the reasonable inference that BDS knew the content of Henry's letters because Manufacturers' advice of September 14 listed BDS as the advising bank. By October 11, or shortly thereafter, Provident learned that Suriel had transferred all of its rights, including all amendments, to BDS. Provident is liable for fraudulent misrepresentation if upon remand the proof shows the elements of fraud and that BDS justifiably relied on Henry's letters as amendments to the LOC when it disbursed Suriel's loan for the use of Provident's customer, RSI. See Restatement (Second) Torts § 531 and comment (d); Michael v. Shiley, Inc., 46 F.3d 1316, 1334-35 (3d Cir. 1995). Restatement (Second) Torts § 532 (1977) provides further support for Provident's potential liability:

> One who embodies a fraudulent misrepresentation in an article of commerce, a muniment of title, a negotiable instru-

20

ment or a similar commercial document, is subject to
liability for pecuniary loss caused to another who deals with
him or with a third person regarding the article or document
in justifiable reliance upon the truth of the representation.

Comment:

b. [T]he maker of a fraudulent misrepresentation incor-
porated in a [commercial] document has reason to expect
that it will reach and influence any person whom the docu-
ment reaches.

Indeed, to hold otherwise would frustrate the purpose of Md. Code
Ann. Com. Law § 5-116(1) and UCP Art. 54(a), which permit parties
to designate letters of credit transferable. Although Maryland courts
have not adopted Restatement (Second) of Torts §§ 531, 532, and 533
(1977), we believe that they would accept the principles stated in
these sections. We know of no state that has rejected them, and no
Maryland case in conflict with them has come to our attention.

VII

To recover for negligent misrepresentation, a plaintiff must prove
that:

(1) the defendant, owing a duty of care to the plaintiff, neg-
ligently asserts a false statement; (2) the defendant intends
that his statement will be acted upon by the plaintiff; (3) the
defendant has knowledge that the plaintiff will probably rely
on the statement, which, if erroneous, will cause loss or
injury; (4) the plaintiff, justifiably, takes action in reliance
on the statement; and (5) the plaintiff suffers damage proxi-
mately caused by the defendant's negligence.

L & P Converters, 100 Md. App. at 568-69, 642 A.2d at 267. Where
the defendant's conduct creates a risk of only economic loss, the
plaintiff must prove that an intimate nexus exists between the parties.
Weisman v. Connors, 312 Md. 428, 446-48, 540 A.2d 783, 791-93
(1988). "The requirement of an intimate nexus is satisfied by contrac-

21

tual privity or its equivalent." L & P Converters, 100 Md. App. at 570, 642 A.2d at 267. In the absence of this nexus, the defendant does not owe a duty of care to the plaintiff and cannot, therefore, be liable in negligence.

In granting Provident's motion for summary judgment, the district court concluded that transferability is not an equivalent of privity. 852 F. Supp. at 436. In essence, this determination recasts the analysis of the fraud claim. For both tort claims, the district court concluded that Provident could not be liable to BDS because there was no relationship between the two.

We believe that BDS has demonstrated a sufficient nexus with Provident to give rise to a duty of care. The Maryland courts have turned to the leading New York cases on tort duties involving economic loss to give meaning to the term "intimate nexus."

> There must be knowledge, or its equivalent, that the information is desired for a serious purpose; that he to whom it is given intends to rely and act upon it; that, if false or erroneous, he will because of it be injured in person or property. Finally, the relationship of the parties, arising out of contract or otherwise, must be such that in morals and good conscience the one has the right to rely upon the other for information, and the other giving the information owes a duty to give it with care. An inquiry made of a stranger is one thing; of a person with whom the inquirer has entered, or is about to enter, into a contract concerning the goods which are, or are to be, its subject, is another.

Weisman, 312 Md. at 447, 540 A.2d at 792 (quoting International Products Co. v. Erie R. Co., 244 N.Y. 331, 338, 155 N.E. 662, 664 (1927)).

In this case, Provident and Suriel agreed to an explicit contractual provision that made the LOC transferable. The effect of the ensuing transfer was to substitute BDS for Suriel. Provident should have been aware that, as a result of transfer, it could become obligated to pay a beneficiary with whom it had not previously dealt. See Henry Harfield, Letters of Credit 97. Transferability necessarily implies the pos-

22

sibility that the issuer may face a new beneficiary. If Provident had not desired such a relationship with an unknown party, it could have objected to transferability and insisted, instead, that Suriel rely on its right of assignment. Md. Code Ann., Com. Law § 5-116(2); UCP Art. 55. Assignment insulates the issuer from the unknown party because the beneficiary is simply alienating its right to receive money due under the LOC. See Harfield, Letters of Credit 96-97. In contrast, transferability contemplates a direct relationship between the issuer and transferee-beneficiary. Again, to deny the existence of privity or its equivalent between the issuer and the transferee of a transferable letter of credit would frustrate the purpose of Md. Code Ann. Com. Law § 116(1) and UCP 54(a). In the present case, the intimate nexus between Provident and BDS provided by transferability requires that Provident be held accountable if the evidence establishes the other elements of negligent misrepresentation. See Weisman, 312 Md. at 448-49, 540 A.2d at 793; see also L & P Converters, 100 Md. App. at 570-72, 642 A.2d at 267-68.

VIII

In conclusion, we hold that BDS has satisfied the requirements of standing. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). The issues concerning the nature and effect of Henry's letters, fraud, and negligent misrepresentation must be submitted in a full evidentiary proceeding to the trier of fact--in this case a jury, unless the jury demand is waived. BDS's recovery, if any, is not barred as a matter of law by Henry's election to send the alleged amendments directly to the beneficiary Suriel instead of transmitting them through Manufacturers. Nor is BDS deprived of standing because Manufacturers did not consent to the alleged amendments. Suriel's request for transfer and Manufacturers' advice of transfer were sufficient as a

23

matter of law to transfer to BDS all of Suriel's rights in the LOC including the alleged amendments.

<u>REVERSED AND REMANDED FOR FURTHER</u>

<u>PROCEEDINGS CONSISTENT WITH THIS OPINION</u>

24